[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10881

_____

DOUGLAS B. STALLEY,
as P.R. of the Estate of Jose Gregory Villegas and
obo ZV and DV, minor children of the deceased,

                                                    Plaintiff-Appellant,

*versus*

SHEILA CUMBIE,
Warden for the Lake Correctional Institution,
et al.,

                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 5:19-cv-00280-KKM-PRL

_____

Before JORDAN, LAGOA, and ED CARNES, Circuit Judges.

LAGOA, Circuit Judge:

This case centers around the death of Jose Villegas. Villegas, a thirty-nine-year-old father of two, was an inmate at the Lake Correctional Institution ("LCI") in Clermont, Florida. Villegas was pronounced dead on March 28, 2017, following an approximately twenty-minute physical confrontation with LCI correctional officers, most of which was captured on video.

The interaction began when officers discovered Villegas unconscious on the floor of his cell and attempted to provide assistance but the situation escalated once Villegas awakened and started resisting. Over the next several minutes, Villegas exhibited various levels of resistance as he went in and out of consciousness, all while being at least partially restrained. At one point, six officers were holding Villegas down as he tried to move on the floor. The altercation ended with the officers holding a limp and fully restrained Villegas down in a wheelchair and transporting him to a nearby medical unit. The trip took about approximately two-and-a-half minutes. On the way, the officers stopped for approximately twenty-five seconds to replace the spit shield that had been placed on Villegas because of his spitting and biting. However, the officers

did not stop to allow the two nurses on scene to evaluate Villegas during the transportation process. Upon arrival at the medical unit, Villegas did not have a pulse, and subsequent efforts to resuscitate him did not succeed.

According to the autopsy report, Villegas's cause of death was restraint asphyxia with excited delirium as a contributing condition. The report also confirmed that Villegas had been under the influence of "K2," a synthetic cannabinoid known to sometimes cause intense delirious and combative reactions.

Douglas B. Stalley filed this lawsuit as the personal representative of Villegas's Estate and on behalf of Villegas's two minor children. Stalley sued the officers involved, their supervisors, and the Florida Department of Corrections ("FDOC") for negligence resulting in wrongful death, excessive force, deliberate indifference, and supervisory liability. After discovery, the defendants moved for summary judgment on all of Stalley's claims. A magistrate judge recommended denying the defendants' motions as to most of Stalley's claims, but the district court largely disagreed. Ultimately, the district court granted summary judgment in favor of the defendants as to Stalley's constitutional claims—i.e., excessive force, deliberate indifference, and supervisory liability for the foregoing—and declined to exercise supplemental jurisdiction over the remaining, state-law wrongful death claim.

Stalley now appeals, challenging only the district court's disposition of the deliberate indifference claim and the associated supervisory liability claim. In doing so, Stalley focuses on the

correctional officers' decision to transport the limp and restrained Villegas to a nearby medical facility without letting the nurses perform any sort of medical assessment, including a pulse check, either on scene or en route. That decision, according to Stalley, poses triable issues of material fact from which a reasonable jury could conclude that the officers exhibited deliberate indifference to a serious medical need in violation of the Eighth Amendment.

Following careful review of the record, including the video footage of the physical altercation at issue, and with the benefit of oral argument, we affirm the district court's summary judgment ruling.

## I.    BACKGROUND

### A.  The Relevant Facts[1]

At a quarter past 4:00 p.m. on March 28, 2017, two LCI correctional officers were patrolling E-dorm, one of LCI's general population housing facilities. As part of that process, one officer walked along the perimeter of the first level and the other walked the same route on the catwalk above, together checking every cell on the two levels of E-dorm.[2] At exactly 4:16 p.m., the officer

---

[1] Our discussion of these facts is taken from audio and video recordings of the events, the testimony of individuals involved, all viewed in the light most favorable to Stalley, and undisputed facts from the district court's summary judgment ruling.

[2] A mounted camera captured video footage of the common area of E-dorm outside of Villegas's cell on March 28, 2017. The mounted camera's footage does not have any audio or show what happened inside Villegas's cell.

patrolling the first level reached Villegas's cell, looked inside, and saw Villegas lying on the floor. Within seconds, the officer alerted his coworker, who promptly ran down from the catwalk. The two of them then entered Villegas's cell at around 4:16:33 p.m.

Moments later, one of the two officers inside Villegas' cell returned to the doorway of the cell to wave a third officer over to the scene. That third officer helped remove Villegas's cellmate from the shared cell and sat him at the closest table in the common area. Four more officers arrived between 4:18 p.m. and 4:19 p.m., including Sergeant Henry Fender, Officer Brent McBride, and Officer Dalton Tifft. Several other officers later trickled in, including Officer William Smith and Sergeant Anthony Key.

According to the officers, at that point, Villegas was still unresponsive and lying on the floor of the cell with signs of vomiting. There also was a "strong odor of something burning." Sergeant Fender, Officer Smith, and Officer Dalton placed Villegas in handcuffs and leg restraints and moved him into a recovery position.[3] Sergeant Fender then performed a sternum rub on Villegas to try to arouse him.[4] That is when the approximately two-hundred-and-seventy-five-pound Villegas awakened and became combative.

---

[3] A "recovery position" is a position in which a person is laid on his side, supported by his limbs, and with his mouth facing downward. It is used in first aid to prevent an unconscious person from choking.

[4] A "sternum rub" is a method of testing a person's responsiveness. It entails firmly rubbing a person's sternum to cause a painful stimulus and arouse an unconscious or unresponsive person.

The officers commanded Villegas to stop resisting and attempted to hold him down while they worked on fully restraining him. Sometime during all this, the officers called for medical assistance.

At 4:25:45 p.m., a mental health nurse arrived at the scene and then briefly spoke with the officers outside of Villegas's cell before leaving. Soon after, at 4:27:13 p.m., Laura Fischer, RN, arrived with a wheelchair, a red jump bag containing certain emergency supplies, and an automatic external defibrillator ("AED").[5] The jump bag did not contain any supplemental oxygen. Upon arrival, Nurse Fischer saw "four to five officers" inside Villegas's cell trying to restrain him while he was "violently resisting" and being "combative." The level of strength that Villegas exhibited, according to Nurse Fischer, was "super-human" and akin to that of a "grizzly bear." She reports that Villegas "literally was lifting [the officers]." Accordingly, the officers had Nurse Fischer wait in the common area just outside the cell for her safety while they tried to restrain Villegas. About two-and-a-half minutes later, at 4:29:41 p.m., another member of the LCI medical staff—Tammy Lee Spencer, LPN—arrived and stood outside the cell with Nurse Fischer. Nurse Spencer heard the officers commanding Villegas to stop resisting.

At approximately 4:31:35 p.m., one of the officers began capturing video and audio of the events with a handheld camera. The footage shows that, at that time, four officers were inside the cell

---

[5] An AED is a portable device that can monitor a heart rhythm, diagnose certain heart issues, and deliver an electric shock to treat cardiac arrest and restore a normal rhythm.

holding Villegas down while directing him to get on his stomach and stop resisting.  Villegas repeatedly attempted to move underneath the officers.  Meanwhile, another officer escorted Villegas's cellmate from the table immediately outside the cell to a bench farther away.  Inside the cell, Villegas's level of resistance escalated at approximately 4:33 p.m., as he began thrashing around on the floor with greater strength.  This caused the officers to have to redistribute their weight and hold Villegas down with greater force, all while repeatedly instructing Villegas to stop resisting.  At approximately 4:33:24 p.m., one of the officers shouted that Villegas was "trying to grab [them]," and then another officer commanded Villegas to "let go" and "stop trying to grab [them]."

Then, at approximately 4:34 p.m., the officers dragged Villegas out of his cell into the common area.  The officers kept ordering him to stop resisting.  The level of resistance escalated once again a few seconds later, as Villegas thrashed and five officers struggled to hold him down.  During a moment of relative peace, Lieutenant Milton Gass, Sergeant Key, and Sergeant Fender instructed the nurses to exit the common area, and someone expressed a need for "more assistance."  According to Nurse Spencer, it was common for officers to instruct nurses to leave the area while an inmate was being aggressive because the nurses are "not trained like correctional officers to handle use of force situations."  Nurse Fischer agreed that, at that time, it would "absolutely not" have been safe

for them to try to provide medical assistance.[6]  The two nurses left the wheelchair and jump bag in the common area and went to wait outside E-dorm, where they had another jump bag.  Villegas then resumed resisting despite the officers' commands to stop.

Between 4:35 p.m. and 4:36 p.m., six more officers arrived at the scene.  Three of the six officers helped physically restrain Villegas and the other three observed from a close distance.  The officers then rolled Villegas over onto his back, at which point Villegas's level of resistance escalated once again.  Then, three more officers arrived.

At approximately 4:36:32 p.m., Sergeant Fender signaled for another officer to obtain a spit shield.  Villegas once again escalated his level of resistance moments later.  During that struggle, one of the officers commanded Villegas to "keep [his] mouth shut," as he attempted to bite the officers.  The officers then rolled Villegas over and worked on securing his arms while he continued to resist.  Another officer escorted Villegas's cellmate out of the common area.  At this point, Lieutenant Gass was still the officer in charge as the first high-ranking officer to arrive; Major Shawn Lee, Captain James Disano, and Assistant Warden Michael Mashburn arrived later to observe the incident, but none of them participated nor assumed command.

---

[6] Nurse Fischer testified that, while she was in E-dorm, she did not see the officers do "anything that shouldn't have been done."

At approximately 4:39:26 p.m., one of the officers restraining Villegas shouted, "hands on legs," which meant that all of the restraints had been put in place. From that point on, Villegas did not actively resist. According to Officer Donald Foster, it "appeared to [him]" that Villegas had passed out at this point, but according to Lieutenant Gass, Villegas was responsive with "shallow breathing" and "the fight . . . out of him." At the direction of Lieutenant Gass, the officers applied a spit shield to keep Villegas from spitting on them, and then propped Villegas up against the nearest table in the common area. Villegas sat motionless with his head down.[7]

At approximately 4:42:03 p.m., the officers began lifting Villegas off the floor and placing him into the wheelchair. The process took about ten seconds, and Villegas vomited again while the officers moved him to the wheelchair. Major Lee claims that Villegas moved his legs to assist himself in standing up, but Sergeant Scott Ake claims that Villegas was moving slightly and demonstrating "passive resistance" as the officers worked on putting him in the wheelchair. Officer Foster, on the other hand, claims that Villegas was passed out. They all, however, report that Villegas was breathing at this time. Lieutenant Gass reports the same, claiming that he intentionally made an assessment to confirm whether Villegas was breathing and that Villegas looked at him. No one checked Villegas for a pulse.

---

[7] For purposes of summary judgment, we assume that Villegas was unconscious from this point forward.

Once Villegas was seated in the wheelchair, the officers immediately began wheeling him out of E-dorm and to F-dorm, where the nearest medical treatment room was located.  Officer Smith testified that they "always took" inmates in need of medical treatment to a medical treatment room because "medical supplies [and] everything that nurses would need" were located in those rooms.  In subsequently justifying the decision to transport Villegas to F-dorm, Lieutenant Gass maintains that Villegas was responsive with shallow breathing at that point and that the F-dorm treatment room was where he would "receive better medical attention" because it had more medical staff and equipment, including supplemental oxygen, and it was more private and secure than the common area of E-dorm.  Lieutenant Gass claims to have not known that the nurses had left the original jump bag containing some medical supplies in the common area.  While they were rushing Villegas to F-dorm, multiple officers kept their hands pressing down on Villegas' arms, shoulders, and neck because of his size and in response to "the violence that [had] occurred."  Villegas remained motionless with his head down.

When the officers reached the doorway to exit E-dorm, they stopped to replace Villegas's spit shield, which had been torn sometime during the encounter.  This interruption lasted approximately twenty-five seconds in total.  The officers then continued with the transportation process and exited the premises of E-dorm.  At this point, Lieutenant Gass relieved command to Major Lee.  Assistant Warden Mashburn did not leave with the group and at no point assumed command over the incident.

As the officers exited E-dorm with Villegas, they passed Nurse Fischer and Nurse Spencer, who were waiting outside after being sent out of the common area during the physical altercation. Nurse Fischer claims that she immediately attempted to approach Villegas but was told by an officer "to stop and back up" and told by Lieutenant Gass that Villegas was breathing, so she and Nurse Spencer ran to follow the group from a short distance instead. According to Nurse Fischer, the officers were traveling "[a]lmost at a running pace" and "really wheeling [Villegas] fast," so she and Nurse Spencer had to "run[]" to keep up. Nurse Spencer similarly claims that she and Nurse Fischer were "not allowed" to treat Villegas during the transportation process. But Nurse Spencer noted that she did not actually ask to treat Villegas at that time because he had to be moved to a secure setting "for safety reasons" and because the officers would not have let her. Lieutenant Gass denies ever telling the nurses that they could not assess Villegas during the transportation process but concedes that they had previously been sent out of E-dorm, began following the group during the outside portion of the transportation process, and were not invited to perform any medical assessment during the trip.

The group continued along the outside path and arrived at the entrance of F-dorm at approximately 4:44:39 p.m. The group reached the doors to the treatment room about ten seconds later, at approximately 4:44:49 p.m. That is when medical staff got involved. Just after they arrived at F-dorm, Nurse Fischer checked Villegas for a pulse and found none. She also determined that Villegas was not breathing. The officers then moved Villegas to the

12                    Opinion of the Court                    22-10881

floor so that the staff could begin performing CPR. Moments later, Villegas vomited once again. The staff continued to perform CPR until EMS arrived and took over. While maintaining the efforts to resuscitate Villegas, EMS eventually moved him into an ambulance and transported him to South Lake Hospital, where he was pronounced dead.[8]

─────────────

[8] In sum, correctional officers discovered Villegas lying on the floor of his cell at approximately 4:16:00 p.m.; officers first entered Villegas's cell at approximately 4:16:33 p.m.; at some point after 4:19 p.m., Villegas awakened and became combative with the officers; Nurse Fischer arrived to the scene with a wheelchair, a jump bag, and an AED at approximately 4:27:13 p.m. and witnessed Villegas violently resisting the officers' attempts to restrain him; Nurse Spencer arrived to the scene at approximately 4:29:41 p.m. and heard the officers order Villegas to stop resisting; the officers moved Villegas out of his cell and into the common area at approximately 4:34:00 p.m.; the officers instructed Nurse Fischer and Nurse Spencer to exit the area at approximately 4:35:12 p.m.; the officers fully restrained Villegas at approximately 4:39:26 p.m.; after applying a spit shield, the officers began lifting Villegas into the wheelchair at approximately 4:42:03 p.m.; the officers placed Villegas in the wheelchair and immediately began the process of transporting him at approximately 4:42:12 p.m.; the officers stopped for a total of approximately twenty-five seconds to replace Villegas's spit shield at approximately 4:42:39 p.m.; the officers exited E-dorm with Villegas, and passed Nurse Fischer and Nurse Spencer without allowing them to assess Villegas, at approximately 4:43:08 p.m.; the officers arrived at the medical treatment room in F-dorm at approximately 4:44:49 p.m.; and, thereafter, medical staff determined that Villegas did not have a pulse and their efforts to resuscitate him did not succeed. Thus, if there had been no delays or pauses, the trip from the common area of E-dorm to the medical unit of F-dorm would have taken approximately two minutes and thirty-seven seconds. In reality, given the decision to place Villegas into a wheelchair and replace the spit shield, approximately five minutes and twenty-three seconds passed between when Villegas became fully restrained and when the group arrived at the medical unit of F-dorm.

Dr. Wendy Lavezzi performed an autopsy the next day at 9:00 a.m.  The autopsy report describes Villegas's body as "that of a normally developed, centrally obese, adult . . . male, weighing 275 pounds [and] measuring 70 inches in length" (slightly over 5'8").[9]  As for external injuries, the autopsy report identifies several bruises, abrasions, and hemorrhages on Villegas's head, eyes, neck, back, arms, hands, knees, and feet.  As for internal injuries, the autopsy report identifies a few hemorrhages in Villegas's mouth and multiple subcutaneous hemorrhages on his back, arms, and legs. The report indicates that an x-ray was performed and that no fractures were found.  The report also indicates that Villegas tested positive for synthetic cannabinoids and had a slightly enlarged heart.  The report concludes that Villegas's cause of death was restraint asphyxia and that excited delirium was a contributing condition.  In other words, the report concludes that the force applied during the physical altercation impeded Villegas's blood flow and put strain on his cardiovascular system, which was exacerbated by his excited delirium and increased heart rate, and ultimately led to cardiac arrest.

When testifying about her autopsy report, Dr. Lavezzi explained that synthetic cannabinoids are stimulants and can "be a

_____

Meanwhile, approximately one minute and forty-one seconds passed between when the group encountered the nurses during the transportation process and when the group arrived at the medical unit of F-dorm.

[9] The autopsy report first identifies Villegas's race as black but later describes his body as being "that of a[n] . . . adult white male."

cause of excited delirium." She also acknowledged that synthetic cannabinoids can sometimes cause users to exhibit "extreme" or "super-human" strength. Nurse Fischer similarly testified that K2 sometimes causes users to "act crazy" and "become combative." Lieutenant Gass likewise testified that, based on his experience with observing the behaviors of inmates on the drug as a prison official, K2 sometimes causes inmates to be "erratic" and "go from zero to a hundred in a split second."

Looking back, Nurse Fischer maintains that she should have been allowed to assess Villegas once he was fully restrained and placed in the wheelchair. At that point, she could have checked him for a pulse and performed CPR, if needed. Nurse Spencer agreed that it "would have been best" if she and Nurse Fischer had been summoned back to E-dorm to assess Villegas once he was fully restrained. But Nurse Spencer also acknowledged that the presence of other inmates in E-dorm was a concern and opined that it "would have been worth it" to take Villegas to the main medical building, which "was a little further [than F-dorm]" but was more spacious and had better equipment than the medical unit in F-dorm.

Lastly, the FDOC's use-of-force policy in effect on March 28, 2017, states, in relevant part, that "[a]ppropriate medical treatment shall be provided immediately [following use of force]." It also states that "[a] Qualified Health Care Provider shall examine any person physically involved in a use of force to determine the extent of injury."

## B. The Procedural History

On March 22, 2019, Stalley initiated a wrongful death action in the Circuit Court of the Fifth Judicial Circuit in and for Lake County, Florida, as the personal representative of the Estate of Villegas and on behalf of his minor children, ZV and DV. The case was removed to federal court on June 6, 2019.

The operative complaint alleged four claims. First, a state-law claim of negligence resulting in wrongful death against the FDOC and Warden Sheila Cumbie. Second, an excessive force claim under 42 U.S.C. § 1983 against Lieutenant Gass, Sergeant Key, Sergeant Fender, Sergeant Ake, Sergeant Anildat Amrit, Officer McBride, Officer Smith, Officer Tifft, Officer Alan Perrotta, and Officer Foster. Third, a deliberate indifference claim under § 1983 against the same group of officers. And fourth, a supervisory liability claim under § 1983 against Lieutenant Gass, Captain Disano, Major Lee, and Assistant Warden Mashburn.

All of the defendants except for Assistant Warden Mashburn (hereinafter, the "Group Defendants") jointly submitted a single answer to the operative complaint on July 27, 2020. Assistant Warden Mashburn (hereinafter, "Defendant Mashburn") submitted his own answer soon after and has generally opted to submit filings separate from the Group Defendants' filings throughout the litigation.

The Group Defendants and Defendant Mashburn filed their motions for summary judgment on June 2, 2021, together challenging all of Stalley's claims. As to the wrongful death claim, the

Group Defendants argued that no reasonable jury could find that negligence occurred.  As to the constitutional claims, the Group Defendants argued that they are entitled to qualified immunity because no reasonable jury could find that any constitutional violation occurred and because they did not violate any clearly established right.  Defendant Mashburn, meanwhile, focused exclusively on the supervisory liability claim—the only claim brought against him—and presented substantially similar arguments, although tailored to his individualized circumstances.

In response, Stalley indicated that he did not oppose summary judgment in favor of Warden Cumbie and Sergeant Amrit but otherwise objected to both motions' recitation of the facts and legal arguments.

On September 24, 2021, after full briefing, the magistrate judge issued a report and recommendation on the two motions for summary judgment in accordance with the district court's referral order.  The magistrate judge recommended: (1) granting summary judgment in favor of Warden Cumbie and Sergeant Amrit on the claims brought against them; (2) granting summary judgment in favor of Lieutenant Gass, Captain Disano, Major Lee, and Assistant Warden Mashburn on the supervisory liability claim in part—insofar as it alleged failure to train or enact policies related to K2; and (3) denying summary judgment on all other claims, which would allow the case to proceed to trial on all four counts.  The Group Defendants and Defendant Mashburn both filed written objections to the magistrate judge's report and recommendation.  Stalley, on

the other hand, declined to file any objections and instead defended the report and recommendation in his responses to the Defendants' objections.

On January 28, 2022, the district court held a hearing on the report and recommendation and the Defendants' objections thereto. Less than a month later, the district court entered an order in which it adopted in part and rejected in part the report and recommendation. The district court adopted the magistrate judge's recommendations as to Warden Cumbie and Sergeant Amrit but otherwise departed from the report and recommendation. As to the excessive force claim, the district court concluded that none of the force used on March 28, 2017, could be found constitutionally excessive by a reasonable jury. As to the deliberate indifference claim, the district court concluded that the decision to transport Villegas to F-dorm rather than attempt to provide care once he was fully restrained could not be found to amount to an Eighth Amendment violation. The district court then added that, even if the decision to transport Villegas rather than furnish on-scene care actually did violate the Constitution, that decision did not violate any "clearly established" right. In other words, the district court determined that the officers are entitled to qualified immunity on two bases: because no underlying constitutional violation occurred and because, even if one did, no "clearly established" right was violated. As to the supervisory liability claim, the district court first noted that Count IV amounts to a shotgun pleading, given that it contains multiple theories of wrongdoing, and then concluded that the absence of any underlying constitutional violation undermines any

claim for supervisory liability. Finally, as to the wrongful death claim, the district court declined to continue exercising supplemental jurisdiction over that state-law claim in light of its determination that summary judgment was warranted as to all of the related federal claims. Accordingly, the district court ultimately entered final judgment in favor of the Defendants on the federal claims and remanded the wrongful death claim to state court.

Stalley timely appealed.

## II.    STANDARD OF REVIEW

We review *de novo* a district court's order granting summary judgment. *Mech v. Sch. Bd.*, 806 F.3d 1070, 1074 (11th Cir. 2015). "Summary judgment is appropriate if 'the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *McCullough v. Antolini*, 559 F.3d 1201, 1204 (11th Cir. 2009) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "When considering a motion for summary judgment, . . . 'courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party and when conflicts arise between the facts evidenced by the parties, [they must] credit the nonmoving party's version.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (alteration in original) (quoting *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006)). We may affirm a grant of summary judgment on any basis in the record, regardless of whether the district court relied on that basis. *See Hill v. Emp.*

*Benefits Admin. Comm. of Mueller Grp. LLC*, 971 F.3d 1321, 1325 (11th Cir. 2020).

## III.    ANALYSIS

On appeal, Stalley challenges only the district court's disposition of the deliberate indifference claim against Gass, Key, Fender, Ake, Amrit, McBride, Smith, Tifft, Perrotta, and Foster (Count III) and the supervisory liability claim against Gass, Disano, Lee, and Mashburn (Count IV) insofar as it is tied to the same conduct, i.e., the alleged deliberate indifference.[10]  The crux of Stalley's argument is that, when properly viewed in the light most favorable to him, the Defendants' decision to transport the fully restrained Villegas to F-dorm without attempting to furnish on-scene medical care presents triable issues of material fact and could be found to constitute deliberate indifference to a serious medical need in violation of the Eighth Amendment.  In light of binding precedent, we hold that the Defendants are entitled to qualified immunity because their conduct did not violate any clearly established right, and we therefore affirm the district court's ruling.

### A. The Deliberate Indifference Claim

We begin with Count III, Stalley's deliberate indifference claim.  Under Supreme Court precedent, "deliberate indifference to [the] serious medical needs of prisoners constitutes the

---

[10] We consider any other challenges to the district court's summary judgment ruling to have been forfeited.  *See United States v. Campbell*, 26 F.4th 860, 871–74 (11th Cir. 2022) (en banc).

'unnecessary and wanton infliction of pain'" in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). To prevail on a claim of deliberate indifference, plaintiffs "must satisfy both an objective and a subjective inquiry," *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003), and must establish a "necessary causal link" between the challenged conduct and their injuries, *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019). The objective inquiry turns on whether the plaintiff experienced an "objectively serious medical need." *Farrow*, 320 F.3d at 1243. The subjective inquiry, on the other hand, turns on whether the "prison official acted with an attitude of 'deliberate indifference' to [the] serious medical need." *Id.* A prison official acted with deliberate indifference if he (1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) engaged in conduct that amounts to subjective recklessness. *See Farmer v. Brennan*, 511 U.S. 825, 836–40 (1994). As we recently reiterated, this third prong will be satisfied only if the plaintiff shows "that the defendant actually knew that his conduct—his own acts or omissions—put the plaintiff at substantial risk of serious harm." *Wade v. McDade*, 106 F.4th 1251, 1253 (11th Cir. 2024) (*en banc*). Even when a defendant has subjective knowledge of a serious risk, "a defendant who 'responds reasonably' to [such] a risk . . . 'cannot be found liable' under the Eighth Amendment." *Id.* at 1255 (quoting *Farmer*, 511 U.S. at 845).

As previewed, the district court entered summary judgment in favor of the officers on this count based on qualified immunity. Qualified immunity is a doctrine that "shields 'government officials

performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Accordingly, the doctrine "protect[s] 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Where, as here, it is undisputed that the defendants were "acting within the scope of [their] discretionary authority," the burden is on the plaintiff to satisfy two prongs: (1) showing that the defendants violated his constitutional rights, and (2) showing that, "at the time of the violation, those rights were 'clearly established . . . in light of the specific context of the case, not as a broad general proposition.'" *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Although the district court determined that Stalley has not met his burden of satisfying either prong, we need only address the second one here. *See Pearson v. Callahan*, 555 U.S. 223, 236–42 (2009) (explaining that federal courts need not address both prongs of the qualified immunity framework and may exercise their discretion to resolve cases based on only one of the two).

A plaintiff can satisfy his burden as to the clearly-established prong of the qualified immunity framework in one of the following three ways:

> First, the plaintiff can point to a materially similar case decided at the time of the relevant conduct by the Supreme Court, the Eleventh Circuit, or the relevant

state supreme court. [This] first method looks at the relevant case law at the time of the alleged violation that would have made it obvious to the officer that his actions violated federal law. The prior case law need not be directly on point, but an "existing precedent must have placed the statutory or constitutional question beyond debate." Second, the plaintiff can identify a broader, clearly established principle that should govern the novel facts of the situation. Third, the plaintiff can show that the conduct at issue so obviously violated the Constitution that prior case law is unnecessary. [For this third route,] [t]he plaintiff must establish that the conduct "lies so obviously at the core of what the alleged constitutional amendment prohibits that the unlawfulness of the conduct was readily apparent to the officer, notwithstanding the lack of fact-specific case law." This third method, often referred to as the "obvious clarity" scenario, is a "narrow exception" to the "normal rule that only case law and specific factual scenarios can clearly establish a violation.

*J W ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259–60 (11th Cir. 2018) (first quoting *White v. Pauly*, 580 U.S. 73, 79 (2017); and then quoting *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011)). In this case, Stalley has attempted to meet his burden using both the first and second methods, but neither attempt is persuasive.

As for the first method of establishing a clear violation, Stalley highlights *Bozeman v. Orum*, 422 F.3d 1265 (11th Cir. 2005),

*abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015), as a "materially similar" case. *Bozeman* was a case in which an unwell inmate was found naked in his cell, and was flooding the room with contaminated toilet water, drinking the water, and vomiting. *Id*. at 1268. The correctional officers on the scene were heard telling the inmate that, if they had to enter the cell, they would "kick his ass" and that he would be "in for a rude awakening." *Id*. As promised, when the officers eventually entered the inmate's cell, a physical altercation ensued. *Id*. at 1268–69. Other inmates reported hearing sounds of punching, slapping, and gagging in addition to the officers saying "[i]s that all you've got?" and "we don't think you've had enough." *Id*. at 1269. The officers then exited the cell with the inmate, who was described at that point as "lifeless," and transported him to an isolation cell over the course of fourteen minutes. *Id*. at 1269–70. While doing so, the officers did not check the inmate's breathing or pulse, did not administer CPR, and did not summon medical help, and, when looking back, offered "no explanation—medical or non-medical—for [those] failure[s]." *Id*. at 1273–74. Upon arriving at the isolation cell, the officers summoned a nurse who came and began life-saving treatment approximately two minutes later. *Id*. at 1270. Soon after, paramedics arrived and transported the inmate to a hospital, where he was pronounced dead with asphyxia as the cause of death. *Id*. Based on these "extreme circumstances," including the officers' "total" and unexplained "failure to address [the inmate's] medical needs during the fourteen-minute [transportation] period," this Court held that the delay in care was actionable under the

Constitution and fell within the general statement of law that "an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." *Id.* at 1273–74 (quoting *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997)). According to Stalley, *Bozeman* is comparable enough to this case to provide the officers with adequate notice that their conduct would violate the Constitution.

The issue with Stalley's comparison, however, is that it ignores several material dissimilarities between *Bozeman* and this case. First, *Bozeman* was decided under our previous (and mistaken) "more than gross negligence" standard. *Bozeman*, 422 F.3d at 1272 (alteration adopted); *see Wade*, 106 F.4th at 1255 (explicitly "repudiat[ing] our dueling 'more than' [negligence or gross negligence] formulations"). Second, even if *Bozeman* were decided under the correct standard, the facts are too far afield to clearly establish a violation here. The officers in *Bozeman* aggressively fought with the inmate and then spent fourteen minutes transporting him to an isolation cell (not a medical unit) before seeking medical care and could not explain their failure to call for medical assistance any sooner. Here, after having already attempted to obtain medical assistance for Villegas, who was unwell and at times highly combative, the officers spent five minutes and twenty-three seconds transporting the fully restrained Villegas, at "[a]lmost a running pace," moving so fast that the nurses had to "run[]" to keep up as they all raced to the medical unit in F-dorm (spending

approximately two minutes and forty-six seconds getting Villegas into the wheelchair and then later pausing for about approximately twenty-five seconds to replace Villegas's spit shield). They did so with the good faith and reasonable belief that the medical unit would be more private, more secure, and have better medical equipment, including supplemental oxygen. *See supra* note 8. Thus, there are material differences between *Bozeman* and this case, including the length of the transportation process, whether the officers hurried to get the inmate there, and whether the intended destination was chosen for the purpose of providing better medical care. Given these differences, it cannot be said that *Bozeman* "made it obvious" to the officers here that the decision to transport Villegas to a nearby medical unit in a hurry, rather than to obtain care on scene or en route, amounted to deliberate indifference.[11] *J W*, 904 F.3d at 1259.

---

[11] In the dissent, our learned colleague also suggests that *Valderrama v. Rousseau*, 780 F.3d 1108 (11th Cir. 2015) controls, based on the premise that "the delay in care is, itself, a wanton infliction of pain and a constitutional violation." *Id.* at 1116. But the facts in *Valderrama* bear no similarity to those at issue here. In *Valderrama*, Detective Rousseau shot Valderrama in the genitals while investigating a potential drug crime. *Id.* at 1110. Rousseau and his colleague, Sergeant Smith, delayed calling an ambulance for more than three minutes and, when Smith finally requested the ambulance, she reported "a laceration" and not a gunshot wound—causing dispatch to "assign[] the call the lowest priority." *Id.* at 1111. Had the officers properly reported the shooting, the ambulance would have arrived seven minutes faster. *Id.* And that seven-minute delay came atop the three-and-a-half minutes the officers waited to call for an ambulance at all. *Id.* On these facts, we held that a jury could find deliberate indifference because the officers delayed Valderrama's medical

As for the second method of establishing a clear violation, Stalley points to the broad principle that "[t]he knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference." *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985). That principle "has put all law-enforcement officials on notice that if they actually know about a condition that poses a substantial risk of serious harm and yet do *nothing* to address it, they violate the Constitution." *Patel v. Lanier County*, 969 F.3d 1173, 1190 (11th Cir. 2020). But that is not what happened here.

Viewing the facts in a light most favorable to Stalley, as we must at the summary judgment stage, the officers spent approximately five minutes and twenty-three seconds rushing a fully restrained and unconscious Villegas, who was struggling to breathe, to a medical unit, which prevented nurses from performing an on-scene medical assessment. All agree, however, that the officers transported Villegas to F-dorm only after they had attempted to obtain on-scene medical assistance but had to send the nurses away

---

care "for more than ten minutes for no good or legitimate reason." *Id*. at 1120. As we have explained, that was not the case here, where the officers rushed Villegas to the unit that they believed was best outfitted to provide suitable medical care. All of this factual distinction comes on top of the fact that, as with *Bozeman*, *Valderrama* was decided under our old, erroneous "more than gross negligence" standard. *Id*. at 1116. As we have explained, and as the concurrence describes in great detail, this standard has no application in our Circuit after our *en banc* decision in *Wade*. *See Wade*, 106 F.4th at 1255. We therefore find *Valderrama* no more instructive than *Bozeman*.

due to his violent behavior.  Thus, this is not a case where officers did *"nothing* to address [Villegas's condition]," *see id.*; they first tried to obtain on-scene medical assistance for Villegas and then, after that proved too dangerous, fully restrained him and then hurried him to a medical unit for medical assistance.  Nor is it one where officers "intentional[ly] refus[ed]" medical care that they knew was necessary; the officers reasonably believed it would be better to rush Villegas to the medical unit rather than wait for nurses to perform an assessment either on scene or en route.  *See Ancata*, 769 F.2d at 703–04; *see also Taylor v. Adams*, 221 F.3d 1254, 1259–60 (11th Cir. 2000) (holding that a nurse did not exhibit deliberate indifference when, after briefly observing an inmate, she instructed an officer to transport him to the hospital and never conducted an examination or provided care herself, given the "emergency circumstances").[12]  In sum, none of the cases cited by Stalley recognize a broad principle that clearly establishes that the officers here violated the law when they (1) opted to transport Villegas to a medical

---

[12] In deciding *Taylor*, this Court also considered the fact that the nurse's decision to transport the inmate was made in compliance with the jail's policy of requiring that unconscious detainees be "referred immediately for emergency care." 221 F.3d at 1259–60. That compliance was "significant" and "militate[d]" against concluding that [the nurse's] actions were wanton." *Id.* at 1260.  But in this case, Stalley insists that the officers *failed* to comply with the FDOC's policy requiring medical treatment "immediately" following any use of force. Even assuming they did, a "failure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence." *Id.* at 1259.  This makes sense, as prisons do not effectively reset the constitutional standard for Eighth Amendment violations by simply implementing more or less stringent medical and safety policies.

unit once he was fully restrained rather than resummon the nurses to the scene or (2) opted to rush Villegas to obtain medical treatment in the F-dorm (approximately one minute and forty-one seconds away) instead of stopping and waiting for the nurses to perform a medical assessment .[13]

Further, the officers' decision to "run[]" an inmate to a medical unit to provide medical care is a reasonable response to a potential medical emergency. *See Wade*, 106 F.4th at 1260–61. That response is still reasonable even though there were nurses on site who might have provided a medical assessment sooner at the cost of delaying the inmate's arrival at the F-dorm medical treatment room. A reasonable decision does not have to be a perfect decision, and it does not require that any potential harm was actually averted. *See Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."); *Mosley v. Zachery*, 966 F.3d 1265, 1271–72 (11th Cir. 2020) (explaining that multiple different responses to a threat can ultimately be reasonable and stating that

---

[13] Stalley cites *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997), *overruled in part on other grounds*, *LeFrere v. Quezada*, 588 F.3d 1317 (11th Cir. 2009), for the general principle that "an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." That principle does not cover this case, where officers denied one form of care (i.e., an on-site assessment) only so as to more quickly secure another (i.e., treatment in the medical unit) with valid medical and safety concerns in mind.

a response's reasonableness is not an "all-or-nothing, one-size-fits-all approach").

Gass testified that the officers decided to take Villegas to the F-dorm treatment room because it had more medical supplies and more medical staff than the E-dorm common area. We know with the benefit of hindsight that the decision did not succeed in saving Villegas' life. But that does not mean it was an unreasonable decision, much less a deliberately indifferent one. *See Powell*, 25 F.4th at 924 ("Qualified immunity leaves room for mistaken judgments.") (quotation marks omitted). And the officers did rush Villegas to the F-dorm treatment room; they were faced with a serious situation and acted seriously in response. Because the officers acted reasonably in the face of Villegas' need for medical care, they certainly were not on notice that their actions constituted an "intentional refusal to provide that care." *Ancata*, 769 F.2d at 704. And as the district court explained, "[t]he decision to take an inmate to a second location for medical care is itself medical care."

Turning to the third method of defeating qualified immunity, Stalley makes no attempt to use it. He does not argue that the officers , here "so obviously" violated the Eighth Amendment that no previous decision directly on point is required. And given that no binding judicial decision clearly establishes that the officers violated the law—either by its resolution of a "materially similar" set of circumstances (method one) or by its establishment of a broader, applicable principle (method two)—the officers are entitled to qualified immunity with respect to Count III.

## B.  The Supervisory Liability Claim

We turn now to Count IV, Stalley's supervisory liability claim against some of the Group Defendants (Lieutenant Gass, Captain Disano, and Major Lee) and Defendant Mashburn (hereinafter, the "Supervisor Defendants").  Stalley contends that, like his deliberate indifference claim, his supervisory liability claim presents triable issues of fact insofar as it is tied to the same conduct, i.e., the alleged deliberate indifference.  Stalley argues that all the Supervisor Defendants were present for some period during the incident on March 28, 2017, and failed to take appropriate action as supervisors to secure necessary medical care.  Stalley further argues that each of the Supervisor Defendants contributed to a custom, practice, or unwritten policy at LCI of delaying medical care following the use of force by transporting inmates to medical units rather than allowing medical assessments to take place on scene.

"The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous."  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1308 (11th Cir. 2009) (quoting *Braddy v. Fla. Dep't of Labor & Emp. Sec.*, 133 F.3d 797, 802 (11th Cir. 1998)).  Further, under our precedent, plaintiffs cannot maintain a supervisory liability claim tied to an alleged underlying constitutional violation if it is determined that no such violation occurred.  *See id.*; *Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008); *Hicks v. Moore*, 422 F.3d 1246, 1253 (11th Cir. 2005).  And even if an underlying constitutional violation *has* occurred, "[a] supervisor cannot be liable . . . if the [subordinate's] constitutional violation was not then clearly established."  *Dukes v. Deaton*, 852 F.3d 1035,

1045–46 (11th Cir. 2017); *see also Keating v. City of Miami*, 598 F.3d 753, 763–67 (11th Cir. 2010).  In other words, if a subordinate is entitled to qualified immunity for his conduct, his supervisor is also entitled to qualified immunity for that same conduct.

Thus, because we have determined that the officers accused of exhibiting deliberate indifference are entitled to qualified immunity, *see supra* Section III.A, the Supervisor Defendants blamed for that alleged deliberate indifference are necessarily entitled to the same.

## IV.    CONCLUSION

For these reasons, we affirm the district court's summary judgment ruling.

**AFFIRMED.**

22-10881                CARNES, J., Concurring                1

ED CARNES, Circuit Judge, Concurring:

I join the majority opinion in full.  I write separately to add to what it says about why we reject our dissenting colleague's position that the defendant officers were deliberately indifferent to the medical needs of a violent inmate whom they had finally been able to subdue.

Immediately after the inmate was restrained the officers rushed him in a wheelchair at a rapid pace to the prison medical treatment room in a nearby dorm where they believed he could get the best treatment.  It took less than five-and-a-half minutes to get him there.  And that includes the 25 seconds they used to protect themselves by putting a mask with a shield on the prisoner because he had earlier attempted to spit on and bite them.  They were not deliberately indifferent to his medical needs, they did not violate his constitutional rights at all, and they certainly did not violate any of his clearly established constitutional rights.  As the district court ruled, the officers are entitled to summary judgment on qualified immunity grounds.

I'll first discuss the deliberate indifference and qualified immunity standards.  Then I will set out the law on dicta and about distinctions between cases, and finally I will explain two independently adequate reasons why the decisions that the dissent relies on fail to establish that the officers violated clearly established law.

I. Deliberate Indifference Under *Wade*

An Eighth Amendment deliberate indifference claim has both an objective component and a subjective component. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wade v. McDade*, 106 F.4th 1251, 1253 (11th Cir. 2024) (en banc). To satisfy the objective component, the plaintiff must show that the deprivation suffered was "sufficiently serious." *Farmer*, 511 U.S. at 834 (quotation marks omitted). There is no dispute that "sufficiently serious" component is an objective standard. Nor should there be any dispute that the subjective component of deliberate indifference is subjective — hence the term "subjective."

If there were any doubt about the deliberate indifference standard being subjective, it was settled by the en banc Court only a few months ago. This is what the Court said:

> For reasons we'll explain, *we now hold*, in accordance with the Supreme Court's decision in *Farmer v. Brennan*, that in addition to an "objectively serious" deprivation, *a deliberate-indifference plaintiff must show that the defendant acted with "subjective recklessness as used in the criminal law,"* 511 U.S. 825, 839 (1994), and that in order to do so, *the plaintiff must demonstrate that the defendant actually knew that his conduct — his own acts or omissions — put the plaintiff at substantial risk of serious harm*. We add the caveat, likewise prescribed by *Farmer*, that even if the defendant "actually knew of a substantial risk to inmate health or safety," he cannot be found liable under the Cruel and Unusual Punishments Clause if he "responded reasonably to th[at] risk." *Id*. at 844.

*Wade*, 106 F.4th at 1253 (emphasis added). That means, as the en banc Court explained, that "[a]n official's failure to alleviate a significant risk that he should have perceived but did not" cannot be condemned as the infliction of punishment, *id.* at 1257 (quoting *Farmer*, 511 U.S. at 838), and "only inflictions of punishment carry liability" for deliberate indifference, *id.* (quoting *Farmer*, 511 U.S. at 839, 841) (quotation marks omitted).

Attempting to stamp out any doubt about the matter, the en banc Court in *Wade* reiterated that key holding. *See id.* at 1255 ("[W]e now repudiate our dueling 'more than' [negligence or gross negligence] formulations and hold instead that *a deliberate-indifference plaintiff must prove that the defendant acted with 'subjective recklessness as used in the criminal law,'* and that in order to do so, the plaintiff *must show that the defendant was subjectively aware that his own conduct put the plaintiff at substantial risk of serious harm.")* (emphasis added) (citation omitted).

And then the Court stated that holding a third time. *Id.* at 1258 ("[W]e hold that a deliberate-indifference plaintiff *must show that the defendant official was subjectively aware that his own conduct — again, his own actions or inactions — put the plaintiff at substantial risk of serious harm.")* (emphasis added).

And then a fourth time. *Id.* ("The first and most important reason for *requiring a deliberate-indifference plaintiff to show that the defendant subjectively knew that his own conduct caused a substantial risk of serious harm* is that *Farmer* is best understood to adopt that rule.") (emphasis added).

And then a fifth time.  *Id.* at 1259 ("Absent *a particularized focus on a prison official's subjective awareness of the risk created by his own conduct*, there is a danger that he could be held liable for conduct that does not remotely resemble the 'inflict[ion]' of 'punishment[.]'") (emphasis added).

And then a sixth time.  *Id.* ("[O]nly *a rule trained on a prison official's subjective awareness of the risk caused by his own conduct — rather than some preexisting risk* — can account for, and sensibly apply to, the full range of deliberate indifference cases.") (emphasis added).

And, then a seventh time:

> For all these reasons, we hold that in order to show that a defendant acted with "subjective recklessness as used in the criminal law," *Farmer*, 511 U.S. at 839, a deliberate-indifference *plaintiff must demonstrate that the defendant was actually aware that his own conduct caused a substantial risk of serious harm to the plaintiff.*

*Id.* at 1261 (emphasis added).  And, perhaps hoping that the eighth time would be the charm, and wanting to make its holding inescapably clear, in the last sentence of its opinion before announcing the result the en banc Court reiterated one more time in *Wade* that:

> [T]he plaintiff must demonstrate that the defendant acted with "subjective recklessness as used in the criminal law," [*Farmer*, 511 U.S.] at 839, and to do so he *must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious*

*harm to the plaintiff*—with the caveat, again, that even if the defendant "actually knew of a substantial risk to inmate health or safety," he "cannot be found liable under the Cruel and Unusual Punishments Clause" if he "responded reasonably to the risk." *Id.* at 844–45.

*Id.* at 1262 (emphasis added).

In spite of all of that fresh-off-the-printer, emphatic iteration and the emphatic multiple reiterations of the binding circuit law in *Wade*, the dissent fails to honor and apply *Wade*'s crystal-clear holding that the plaintiff must establish that the "defendant actually knew" — actually knew — that the defendant's own acts or omissions put the plaintiff at "substantial risk of serious harm." *Id.*

Instead of following *Wade*, the dissent attempts to apply an objective, should-have-known, best-medical-practices, negligence-related standard. In the dissent's view, the officers in this case are liable under the Eighth Amendment because it was "objectively unreasonable" for them to rush from a dorm where two nurses were present to a nearby dorm with a medical treatment room the officers believed was better equipped, had oxygen, and had an on-call doctor so that the inmate could receive better care. *See* Dissent at 21–22.

The dissent's conclusion that the officers' particular response to the medical emergency was "objectively unreasonable" rests on an after-the-fact assessment by medical experts of what would have been the best medical practice in the circumstances. Dissent at 11–15. But none of the defendant officers is a doctor or

nurse, and there is no evidence that any of them ever had any medical training. *See infra* at 47–50 (discussing how the plaintiff's expert opinion testimony went to best medical practices instead of what the non-medically trained officers believed in good faith was the best thing to do for the prisoner).

The bigger point is, as just discussed, that the deliberate indifference standard has an irreducibly subjective component. And there is no evidence at all in this case that any of the officers was "actually, subjectively aware" that rushing the prisoner to what they believed was the best medical facility to treat him was conduct that would "cause[] a substantial risk of serious harm" to him. *See Wade*, 106 F.4th at 1262. There is no evidence that they did not believe they were doing what was best for him.

The dissent's focus on objective reasonableness contradicts the standard the Court so recently pronounced in *Wade*: "a deliberate-indifference plaintiff must show that the defendant acted with 'subjective recklessness as used in the criminal law,'" with the "caveat" that a defendant "cannot be found liable under the Cruel and Unusual Punishments Clause if he 'responded reasonably to that risk.'" 106 F.4th at 1253 (quoting *Farmer*, 511 U.S. at 839, 844). While the dissent acknowledges the existence of those two separate components, it conflates the purely subjective requirement of a defendant knowing that his conduct caused or threatened a substantial risk of serious harm to the inmate (a subjective component), with the exception from deliberate indifference liability if the defendant, regardless of his subjective mental state, acted

reasonably (an objective measure).  The dissent conflates those two separate components by asserting that the officers' actions were objectively unreasonable (based largely on the professional knowledge of medical care providers) and treating that as proof that the defendants acted with subjective criminal recklessness.  *See* Dissent at 16–17, 19–23; *see also see infra* at 47–50 (addressing the inappropriateness of relying on the knowledge of doctors and nurses to assess the defendant officers' own state of mind).

The dissent is mistaken to skip so lightly over the subjective requirement.  We don't get to the objective measure exception from liability of acting reasonably unless and until the plaintiff has proven that the defendant subjectively knew that there was a substantial risk that his conduct would cause harm.  And the plaintiff hasn't made that showing here.  He has not shown that the correctional officers, none of whom was a doctor, or nurse, or paramedic, knew they were causing Villegas a substantial risk of harm by rushing him to the medical treatment facility that they thought was best equipped to provide him with care.  If a defendant did not know – – actually realize and know, as we required in *Wade* — that his conduct would cause or threaten a substantial risk of serious harm, he was not deliberately indifferent.  And if he is not liable for that reason, we have no need to reach the question of whether he would be excepted from liability anyway because he acted in an objectively reasonable way.  *See Wade,* 106 F.4th at 1253 (adding to a discussion of the elements of a deliberate indifference claim "the caveat . . . that even if the defendant actually knew of a substantial risk to inmate health or safety, he cannot be found liable . . . if he

responded reasonably to that risk") (cleaned up); *id.* at 1257 (characterizing the objective reasonableness exception as "a coda of sorts" that the *Farmer* Court appended to its decision).

In any event, in the quarter of a century since the Supreme Court's *Farmer* decision, it has been settled that the second element an inmate plaintiff must prove to have a valid deliberate indifference claim is that the defendant prison official or officer had "a sufficiently culpable state of mind," which is "one of deliberate indifference to inmate health or safety." 511 U.S. at 834 (quotation marks omitted). In the period between the *Farmer* decision and our *Wade* decision, we articulated the standard for that second element, the sufficiently culpable state of mind, as being something more than negligence. *See Wade*, 106 F.4th at 1254. Whether the standard was more than mere negligence or more than gross negligence our decisions did not, to put it charitably, make clear. *See id.* But our decision in *Wade* mooted all of that lack of clarity by adopting the criminal recklessness standard and tossing out the negligence-based standards that had plagued our circuit law for years. *See id.* at 1254–57.

## II. Qualified Immunity

Even if the plaintiff in this case could establish that what the defendant officers in this case did or failed to do was deliberate indifference, that would not be enough to prevail. It would not be enough because the defendants have raised the defense of qualified immunity. Given that they were indisputably acting within their discretionary authority, the defendants are entitled to qualified

immunity unless it is shown that under clearly established law in existence at the time, their actions amounted to deliberate indifference. *See, e.g.*, *Wade v. Daniels*, 36 F.4th 1318, 1323, 1326–28 (11th Cir. 2022) (concluding that officers performing discretionary duties were entitled to qualified immunity on deliberate indifference claim); *Marbury v. Warden*, 936 F.3d 1227, 1232–33 (11th Cir. 2019) (same as to a defendant prison official).

We recognize three ways in which a plaintiff can show that the law is clearly established for qualified immunity purposes: (1) "by pointing to a materially similar decision of the Supreme Court, of this Court, or of the supreme court of the state in which the case arose," *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022); (2) by referring to a "broad statement[] of principle" that is "established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted," *Terrell v. Smith*, 668 F.3d 1244, 1256 (11th Cir. 2012) (quotation marks omitted); or (3) "by convincing us that the case is one of those rare ones that fits within the exception of conduct which so obviously violates the constitution that prior case law is unnecessary," *Powell*, 25 F.4th at 920 (alteration adopted) (quotation marks omitted).

The dissent relies primarily on the first approach. *See* Dissent at 2–3. Under that method, the law can be shown to be clearly established if "case law previously elucidated in materially similar factual circumstances clearly establishes that the conduct is

unlawful." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1209 (11th Cir. 2007). In making that determination, we must not "define clearly established law at a high level of generality"; instead, we "ask whether the violative nature of *particular* conduct is clearly established," which is a question we answer "in light of the specific context of the case, not as a broad general proposition." *Crocker v. Beatty*, 995 F.3d 1232, 1241 (11th Cir. 2021) (quotation marks omitted); *see Corbitt v. Vickers*, 929 F.3d 1304, 1316 (11th Cir. 2019) ("[T]he qualified immunity analysis requires a clearly established right to be defined with specificity.").

The specificity we require from the facts of materially similar cases is especially important in the deliberate indifference context. *See Mosley v. Zachery*, 966 F.3d 1265, 1272 (11th Cir. 2020) ("In deliberate-indifference cases, as in life, context matters."); *Youmans v. Gagnon*, 626 F.3d 557, 564 (11th Cir. 2010) (concluding that a jail official did not violate clearly established law, explaining: "Judicial decisions addressing deliberate indifference to a serious medical need, like decisions in the Fourth Amendment search-and-seizure realm, are very fact specific. . . . [S]pecific cases of deliberate indifference are complicated: the threshold of deliberate indifference is connected to combinations of diverse interdependent factual elements."); *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1318 (11th Cir. 2010) ("Questions of deliberate indifference to medical needs based on claims of delay are complicated questions because the answer is tied to the combination of many facts; a change in even one fact from a precedent may be significant enough to make it debatable

among objectively reasonable officers whether the precedent might not control in the circumstances later facing an officer.").

The dissent also argues that "in a delay-of-care case involving a life-threatening condition, a prior case directly on point is not needed" to show clearly established law.  Dissent at 8 n.2; *see also id.* at 18.  That argument attempts to fit within the second method of showing clearly established law, under which sometimes "authoritative judicial decisions *may* establish broad principles of law that are clearly applicable in a variety of factual contexts going beyond the particular circumstances of the decision that establishes the principle."  *Griffin*, 496 F.3d at 1209 (alteration adopted) (emphasis added) (quotation marks omitted).  *See* Dissent at 1–2, 8 n.2, 18, 23.  Not "do," but "may."

Only in the rarest of circumstances do we strip officials of qualified immunity based on broadly stated principles of law. "[S]uch decisions . . . arise where precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle that factual differences are often immaterial to the later decisions."  *Corey Airport Servs., Inc. v. Decosta*, 587 F.3d 1280, 1287 (11th Cir. 2009) (alterations adopted) (quotation marks omitted). The reason these cases are so "rare" is that "most judicial precedents are tied to particularized facts."  *Id.* (quotation marks omitted); *see also Powell*, 25 F.4th at 921 ("We have recognized that obvious clarity is a narrow exception to the normal rule that only case law and specific factual scenarios can clearly establish a violation.") (quotation marks omitted); *Griffin*, 496 F.3d at 1209 (stating that

reliance on a case with materially similar facts is the "most common" way to show clearly established law). As the discussion about the *Lancaster*, *Bozeman*, and *Valderrama* decisions in Part V, below, shows, this case is not one of those rare, broad principles of law cases. Instead, the material facts matter, and no broad principle holding put the defendants on notice that their actions or inactions violated clearly established law. *See* Majority Op. at 26–29.

### III. Pre-*Wade* Decisions Cannot Clearly Establish That Deliberate Indifference Exists in a Post-*Wade* Case

The particular facts of each of the cases the dissent cites make them distinguishable from the present one. As a result, they cannot and do not clearly establish for qualified immunity purposes the law that applies to this case with its materially different facts. I will discuss why that is so, explaining how each of those cases is distinguishable from this one, in Part V, below.

But first, there is an additional and more general reason that all of the decisions the dissent relies on are of no use in determining whether an action or inaction amounts to deliberate indifference under controlling law. The overriding reason that the decisions are not helpful, much less controlling — much, much less clearly controlling — is that all of those decisions were decided under our old, pre-*Wade* deliberate indifference regime. All of those decisions used negligence-based measures ("more than negligence" or "more than gross negligence") of deliberate indifference. That entire negligence-measure regime was recently scrapped and replaced with a criminal-recklessness-measure regime. *See Wade*, 106 F.4th 1252.

As a result, all of the pre-*Wade* decisions, which are the foundation of the dissent's position in this case, are obsolete, extinct, gone, insofar as establishing that deliberate indifference does exist in a post-*Wade* conduct case.[1]

---

[1] That statement needs one addendum. While pre-*Wade* negligence-standard decisions cannot be binding precedent establishing deliberate indifference *does* exist in post-*Wade* conduct cases, they can be binding precedent establishing that deliberate indifference does *not* exist in post-*Wade* conduct cases. Here's why. If a pre-*Wade* published decision holds that a particular set of facts did *not* meet the more-than-negligence or the more-than-gross-negligence standard, which was law then, it necessarily follows that materially identical or less extreme facts cannot meet the more demanding post-*Wade* deliberate indifference standard either. If a set of facts is insufficient to show more than negligence or more than gross negligence, those same facts cannot show the criminal recklessness that *Wade* requires for deliberate indifference.

    This is the same logic this Court has used in other cases to hold that the failure to meet a less stringent standard compels a holding that a more stringent one was not met. *See United States v. Gray*, 260 F.3d 1267, 1279 (11th Cir. 2001) (holding that because the defendant failed to meet the lower preponderance-of-the-evidence burden of proof, it necessarily followed that he could not meet a higher clear-and-convincing burden of proof); *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1303 (11th Cir. 2001) (holding that because the applicants failed to show a fear of persecution sufficient for an asylum claim, it followed that they could not make the higher showing necessary to support a claim under the Convention Against Torture); *Carrizo v. U.S. Att'y Gen.*, 652 F.3d 1326, 1331 (11th Cir. 2011) ("A petitioner's inability to meet the standard of proof for asylum generally precludes the petitioner from qualifying for withholding of removal."); *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1288 n.4 (11th Cir. 2005) ("Because [petitioner] has failed to establish a claim of asylum on the merits, he necessarily fails to establish eligibility for withholding of removal or protection under CAT.").

All of the dissent's old-regime decisions finding that deliberate indifference existed are beside the point because they applied either the more-than-negligence standard or the more-than-gross-negligence standard.  None of them applied the more-difficult-to-meet *Wade* criminal recklessness standard.  The entire purpose of going en banc in *Wade* was to throw into the judicial dumpster the unsatisfactory negligence-based measures of deliberate indifference and the decisions applying those measures, and replace them with the criminal recklessness standard and decisions applying it.

---

The dissent calls this treatment of our deliberate indifference precedent a "one-way ratchet."  Dissent at 18–19 n.5.  But if our deliberate indifference decisions have been ratcheted in one direction, it is this Court's en banc decision in *Wade* that created the ratchet and controls the direction in which it has moved our case law.

Of course, this is not a case in which we need to decide whether a pre-*Wade* decision holding that deliberate indifference did not exist in that earlier case is binding precedent that it doesn't exist in this case.  Because this is a qualified immunity case, the defendants don't have to show that the law is clearly established that they did not act with deliberate indifference.  Instead, the burden runs in the opposite direction, requiring the plaintiff to show that it is clearly established the defendants did act with deliberate indifference.

I freely admit that some of the statements in this footnote are dicta.  About that, I plead in my defense that, while not binding no matter how few or how many judges join it, "[d]icta has its place and serves some purposes."  *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1314 (11th Cir. 1998) (Carnes, J., concurring).  For example, "[s]omewhat like statements in a law review article written by a judge, or a judge's comments in a lecture, dicta can be used as a vehicle for offering to the bench and bar that judge's views on an issue, for whatever those views are worth."  *Id.* at 1315.

*See Wade*, 106 F.4th at 1255. And that is exactly what *Wade* did. The post-*Wade* criminal recklessness standard, drawn from criminal law, is undeniably a more difficult one for a plaintiff to meet than either of the negligence-measurement standards that had been used in pre-*Wade* decisions.

My dissenting colleague distinguishes between pre-*Wade* decisions using the "more than gross negligence" standard and those using the "more than mere negligence" one of the same era. Dissent at 18–19 n.5. But it doesn't matter which of the two outdated standards was stricter or more outdated or more obsolete for establishing the existence of deliberate indifference. All of the pre-*Wade* era decisions applied one of the two negligence standards, and *Wade* jettisoned both of them in favor of the more-difficult-to-meet criminal recklessness standard.

It necessarily follows that pre-*Wade* negligence-measurement cases cannot serve as binding precedent to establish deliberate indifference in the post-*Wade* era. They can't because when a deliberate indifference claim was up for decision before *Wade* existed, that panel did not apply or purport to apply the criminal recklessness deliberate indifference standard adopted in *Wade*. That earlier panel had no occasion to determine whether the facts of the case amounted to criminal recklessness because that was not the deliberate indifference standard that applied then.

The dissenting judge is of the view that we can and should go dumpster diving for those old, pre-*Wade* cases and try to recycle them into something they are not but that he wishes they were,

which is post-*Wade*-era criminal-recklessness-standard precedent. He would have us imagine the result he thinks might have been reached and the holding he thinks might have been announced if the post-*Wade* standard had been applied in the old case instead of either of the old negligence-based pre-*Wade* standards. Even though everyone agrees that is not at all what happened.

In other words, the dissent would have us imagine what might have happened *if* the parties in the old case had known to brief the yet-to-be announced *Wade* standard; and *if* they had known to orally argue that standard; and *if* the panel in that old case had applied the not-then-existing *Wade* standard in the old case instead of the standard it was required to apply under the then-existing law. If, if, and if. To perform that fanciful enterprise, we would have to put ourselves in the former panel's mind and re-decide the old case anew, guided by conjecture, fueled by speculation and giving free rein to imagination, with guesses galore. And once we conjectured and speculated ourselves to what a different panel might have decided under a different standard in the old case, but didn't decide, the dissent would have us pretend that the "holding" of the old case, which never actually existed, does exist, and that it binds us even though it is not a prior panel holding in any real sense of the term. All of this the dissent would have us do to satisfy its longing for what was not decided in previous cases but might have been, bringing to mind the plaintive words of Whittier: "For of all

sad words of tongue and pen / The saddest are these: 'It might have been!'" John Greenleaf Whittier, "Maud Muller."[2]

To put it less poetically, the dissent's decision-by-what-might-have-been instead of decision-by-what-was is not how the judicial process works. It is not how courts decide cases and announce law. It is not how they ever have. And it's good that they haven't and don't, because courts do not have the judicial equivalent of a time travel machine. A panel of judges cannot know how a past panel consisting of different judges on a different occasion after hearing arguments from different attorneys would have decided a case under a standard different from the one that the older panel was obligated to apply, and did apply, under what was then circuit law. Cases are decided, holdings reached, and precedent made when cases are originally briefed and argued to and decided by a court. When the time for further appeals runs and the mandate issues, the judgment in a case becomes final. The decision in the case becomes the decision in the case once and for all. That's basic Judicial Process 101.

Besides, the purpose of qualified immunity is to put officers on notice at or before the time they act or fail to act about the law they must obey. *Perez v. Suszczynski*, 809 F.3d 1213, 1222 (11th Cir. 2016) ("The 'salient question' is whether the state of the law at the time of the incident gave [the officers] 'fair warning' that [their] conduct was unlawful.") (quoting *Hope v. Pelzer*, 536 U.S. 730, 741

---

[2] https://perma.cc/5XB3-QNCB (last visited Dec. 4, 2024).

(2002)); *Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1237 (11th Cir. 2010) (explaining that officials are not entitled to qualified immunity where they are "on notice of the unlawfulness of their conduct"). It is contrary to that purpose to hold officers personally liable based not on decisions in effect at the time they acted but based on how judges, after the officers acted, may imagine that decisions handed down before the officers acted might, or might not, have been decided under a different standard by different judges.

The dissenting judge floated his retrospective, reconstruction theory of reimagining and remaking past precedent before the en banc Court in *Wade* in a concurring opinion. *See* 106 F.4th at 1265 (concurring opinion of Jordan, J.). But a majority of the judges participating in the *Wade* decision did not join his opinion or express any support for his position. *Id.* at 1252, 1262 (reflecting that only three judges of the other twelve judges who participated in the decision joined Judge Jordan's concurrence).

The dissent insists that *Wade* "said nothing whatsoever about abrogation" and could not have "*sub silentio*[] abrogated three decades of Eighth Amendment case law." Dissent at 18–19 n.5. But *Wade* was not silent about its repudiation of the pre-existing more-than-negligence and more-than-gross-negligence standards. It could hardly have been less *sub silentio* about that. Eight times the en banc Court explicitly stated that there was a new standard, criminal recklessness as used in the criminal law, that supplanted the old negligence-based standards. *See* Part I, *supra* at 1–5. To take just one example, the en banc Court stated:

> [W]e granted rehearing en banc to clarify the stand-
> ard for establishing liability on an Eighth Amendment
> deliberate-indifference claim. Having reconsidered
> the issue, *we now repudiate our dueling more than [negli-*
> *gence or gross negligence] formulations and hold instead*
> *that a deliberate-indifference plaintiff must prove that the*
> *defendant acted with subjective recklessness as used in the*
> *criminal law*, and that in order to do so, the *plaintiff*
> *must show that the defendant was subjectively aware that*
> *his own conduct put the plaintiff at substantial risk of seri-*
> *ous harm.*

106 F.4th at 1255 (emphasis added) (citation omitted) (quotation
marks omitted). Choosing a standard of deliberate indifference
was, after all, why en banc review was conducted.

My dissenting colleague also asserts that "to constitute abro-
gation an en banc decision like *Wade* 'must demolish and eviscerate
each of [the prior decision's] fundamental props,'" which he thinks
*Wade* did not do. Dissent at 18–19 n.5 (quoting *United States v. Du-*
*bois*, 94 F.4th 1284, 1293 (11th Cir. 2024)) (brackets in Dissent). The
term "fundamental props" refers to independent "bases" — i.e., "al-
ternative rationales" — supporting one "holding." *Del Castillo v.*
*Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir. 2022) (quo-
tation marks omitted); *see also Dubois*, 94 F.4th at 1293 (quoting *Del*
*Castillo*, 26 F.4th at 1223 on "fundamental props"). If the holding
of a prior panel "rests on two bases, only one of which has been
rejected by the Supreme Court [or this Court sitting *en banc*] while

20                    CARNES, J., Concurring                22-10881

the other basis has not been," then the prior panel's holding has not been abrogated. *Del Castillo*, 26 F.4th at 1223.

But that's not what happened here.  The pre-*Wade* precedent on which the dissent relies depended on the application of either of two negligence-based standards that *Wade* explicitly stated that it was now "repudiat[ing]": the old more than negligence and the old more than gross negligence standards.  106 F.4th at 1255 ("[W]e now repudiate our dueling 'more than' [negligence-based] formulations . . . .").  Repudiate, demolish, eviscerate are synonyms.  And regardless of which verb one chooses to express the passing of the negligence-based standards, they are finished, gone, kaput insofar as establishing that deliberate indifference occurred is concerned.[3]

The dissent protests that I want to "do away with 30 years of Eleventh Circuit deliberate indifference precedent."  Dissent at 18–19 n.5.  That misconceives my position in two fundamental ways.  First, I don't "want" anything except to recognize what our recent *Wade* decision held, and to give effect to its holding "repudiating" the past negligence-based standards in favor of a criminal recklessness standard, even though it is a more difficult one for a plaintiff to meet.  What effect the *Wade* decision has on pre-existing precedent is the result of the *Wade* decision, not my "want[s]."

_____

[3]  But perhaps not insofar as the decisions holding that deliberate indifference did not exist are concerned.  *See supra* at 13–14 n.1.

Second, I do not believe that *Wade* rendered all of our pre-*Wade* decisions obsolete. Each of those decisions still holds that under its particular facts the conduct involved was either more or less than negligence or more or less than gross negligence, depending on which of those two pre-*Wade* standards were applied. Those holdings do still exist. What has changed is that those holdings, which address only the two old, negligence-based standards, are not enough to bind a post-*Wade* panel to hold that deliberate indifference does exist under those facts. They are not enough to do that because the standard has changed and those pre-*Wade* decisions did not apply the criminal recklessness standard that *Wade* requires. They did not even pretend to do so.

For all of these reasons, I disagree with the dissent's attempt to survey the precedential graveyard, resurrect the dead parts of prior precedent, and Frankenstein them into life in ways that our precedential system of law never intended and does not permit. Pre-*Wade* decisions, applying as they did their greater-than-negligence or greater-than-gross-negligence deliberate indifference standards, cannot be used as precedent that clearly establishes deliberate indifference in the post-*Wade* era with its more exacting criminal recklessness standard. None of the dissent's pre-*Wade* decisions — which is to say all of those that are cited in support of the dissenting position — can be used to establish the existence of deliberate indifference in this post-*Wade* case. None of them.

IV. Dicta

In any event, even if we went along with the dissent's unprecedented, radical approach to retrofitting past decisions into new precedent, it would make no difference in this case. It would not because the decisions the dissent relies on to clearly establish the law, don't. And they don't for reasons in addition to the fact that they were decided using outmoded negligence-based measures instead of the new *Wade* criminal recklessness standard. One reason they don't has to do with the impotency of dicta when it comes to precedent.

Showing clearly established law almost always requires pointing to the holding in a materially similar case, and it bears repeating that "[a] decision can hold nothing beyond the facts of that case." *United States v. Birge*, 830 F.3d 1229, 1233 (11th Cir. 2016) (alteration adopted) (quoting *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010)); *Chavers v. Sec'y, Fla. Dep't of Corr.*, 468 F.3d 1273, 1275 (11th Cir. 2006) ("The holdings of a prior decision can reach only as far as the facts and circumstances frame the precise issue presented in that case."); *Castillo v. Fla., Sec'y of DOC*, 722 F.3d 1281, 1290 (11th Cir. 2013) ("We have pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case."); *Black v. United States*, 373 F.3d 1140, 1144 (11th Cir. 2004) ("[T]he holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced the decision.") (quotation marks omitted).

As we have explained, "[s]tatements in an opinion that are not fitted to the facts, or that extend further than the facts of that case, or that are not necessary to the decision of an appeal given the facts and circumstances of the case, are dicta." *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 762 (11th Cir. 2010) (citations omitted) (quotation marks omitted). Anything in an opinion that goes "beyond the facts of that case" is dicta. *Edwards*, 602 F.3d at 1298. And "[d]icta is not binding on anyone for any purpose." *Welch v. United States*, 958 F.3d 1093, 1098 (11th Cir. 2020) (quotation marks omitted); *see Birge*, 830 F.3d at 1233 ("We are not bound by the dicta contained in our earlier opinions.").

Because dicta cannot establish law — period — it certainly cannot clearly establish law for purposes of defeating a qualified immunity defense. *Santamorena v. Ga. Mil. Coll.*, 147 F.3d 1337, 1342 n.13 (11th Cir. 1998) ("We have already stated that the law cannot be established by dicta. Dicta is particularly unhelpful in qualified immunity cases where we seek to identify clearly established law.") (alteration adopted) (quotation marks omitted); *Jones v. Cannon*, 174 F.3d 1271, 1288 n.11 (11th Cir. 1999) ("This Circuit has held that dicta cannot clearly establish the law for qualified immunity purposes."); *Hamilton v. Cannon*, 80 F.3d 1525, 1531 (11th Cir. 1996) (reversing a denial of qualified immunity where "the district court relied upon dicta . . . as having clearly established the law, something that dicta cannot do"), *superseded on other grounds as recognized in Waldron v. Spicher*, 954 F.3d 1297, 1306 (11th Cir. 2020).

The categorical irrelevance of dicta in qualified immunity cases stems from the purpose of the doctrine itself, which exists "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope*, 536 U.S. at 739 (quotation marks omitted). That means "[f]or a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quotation marks omitted). Dicta cannot put officers on notice that their conduct is unlawful because dicta cannot make any action or inaction unlawful. Dicta is simply not the law, no matter how eloquent or emphatic the wording. *See Birge*, 830 F.3d at 1233. If it were otherwise, in addition to having to heed clearly established law, officers would have to heed a judge's musings and "speculative pronouncements about hypothetical questions." *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1315 (11th Cir. 1998) (Carnes, J., concurring). We've never considered judges, law enforcement officers, or others to be bound by musings and speculative pronouncements of judges. As we explained in *Pretka*: "We are not required to follow dicta in our own prior decisions. Nor for that matter is anyone else." 608 F.3d at 762 (citations omitted).

V. The Distinguishable Decisions the Dissent Relies On

As we have repeatedly held, a case that is fairly distinguishable from the one at hand cannot be binding precedent that clearly establishes the law for qualified immunity purposes. *See Davis v. Waller*, 44 F.4th 1305, 1312 (11th Cir. 2022) ("A case that is fairly distinguishable from the circumstances facing a government official

cannot clearly establish the law for the circumstances facing that government official.") (alterations adopted) (quotation marks omitted); *Griffin*, 496 F.3d at 1209 ("When fact-specific precedents are said to have established the law, a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official; so, qualified immunity applies.") (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1352 (11th Cir. 2002)); *see also* Majority Op. at 21–25.

That leads us to the decisions the dissent asserts clearly establish that the defendant officials violated the law in this case. I have already explained (repeatedly, I confess), why those pre-*Wade* negligence-era decisions cannot possibly clearly establish deliberate indifference in post-*Wade* criminal recklessness-era cases like the present one because they applied different deliberate indifference standards. *See* Part III, *supra* at 12–21. But even putting aside for the time being the fact that the dissent's decisions are all pre-*Wade* decisions inapplicable to an assertion of deliberate indifference, there is another independently adequate reason that those decisions would not defeat the qualified immunity defense in this case anyway. That additional reason is that they are all distinguishable on the facts from this case.

## A.  The *Lancaster* Decision

The dissent puts forward the *Lancaster* decision as support for its position that the defendants in this case violated clearly established law. *See Lancaster v. Monroe Cnty.*, 116 F.3d 1419 (11th Cir.

1997), *overruled in part on other grounds involving state law as recognized in LeFrere v. Quezada*, 588 F.3d 1317 (11th Cir. 2009). The dissent cites *Lancaster* for the proposition that it is clearly established that "an official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate," or if the official "intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." *Id.* at 1425; *see* Dissent at 1–2. But those broad statements in the opinion cannot clearly establish those propositions because they are not *Lancaster*'s holding, and they have no application in a materially dissimilar case like the present one.[4]

---

[4] The dissent proposes that *Lancaster* clearly established the law against these defendants both on the theory that it's a materially similar case and on the theory that it states general principles of law that apply with obvious clarity. *See* Dissent at 2–3. As I'll explain, *Lancaster* is not materially similar to this case. And to the extent *Lancaster* is one of those "rare" decisions establishing a broad principle of law to which "few facts are material," no such principle put the defendant officials in this case on notice that they were violating the Eighth Amendment. *Corey*, 587 F.3d at 1287 (quotation marks omitted). As the discussion that follows in the text demonstrates, the "particularized facts" matter in *Lancaster* (as they almost always do), and they matter in this case, too. *Id.* (quotation marks omitted). And the proposition that officers or officials violate the Constitution when they "fail[] or refuse[] to obtain medical treatment" or "intentionally delay[]" the provision of care, *Lancaster*, 116 F.3d at 1425, has no application in this case.

It has no application here because these defendant officers plainly did not fail or refuse to obtain medical treatment for Villegas nor did they

We did make some broad statements in the *Lancaster* opinion. *See* 116 F.3d at 1425. But statements in an opinion are one thing and holdings are another. Regardless of what an opinion says, the holding of a case cannot extend beyond the facts of the case. *See, e.g., Birge*, 830 F.3d at 1233; *Castillo*, 722 F.3d at 1290; *Black*, 373 F.3d at 1144. It's a ground rule principle of law that no judicial decision can establish law for a case with materially distinguishable facts. *See Santamorena*, 147 F.3d at 1342 n.13; *Jones*, 174 F.3d at 1288 n.11; *Hamilton*, 80 F.3d at 1531. And *Lancaster*'s facts are materially different from the facts in this case. As a result, *Lancaster* did not, and could not, clearly establish that what the defendants did in this case amounts to deliberate indifference.

In *Lancaster*, the decedent, Harold Michael Lancaster, was arrested for driving under the influence of alcohol at around 7:45 p.m.; his blood alcohol content was more than three times the legal

---

intentionally delay providing care. As the district court correctly stated, "[t]he decision to take an inmate to a second location for medical care is itself medical care," and the officers did that "promptly." Lieutenant Gass, one of the defendant officers, testified that the purpose of quickly ferrying Villegas to the medical treatment room was to provide him with medical care. The dissent characterizes the officers' actions as a "delay of medical care for over five minutes." Dissent at 16. But as I'll show, the officers used those five minutes and 23 seconds to rush Villegas to the place they believed he would receive the best treatment. *See infra* at 33–36, 40–41, 45, 45–46 n.7. In that time, the officers prepared Villegas for transport by equipping him with a spit shield, momentarily propping him up against a table, and placing him into a wheelchair; then they rushed Villegas to a medical treatment room, stopping once for 25 seconds to replace his spit shield. *See* Majority Op. at 8–11. Nowhere in that five-minutes-and-change was there any "delay."

limit.  106 F.3d at 1421 & n.2.  He was taken to the Monroe County Jail and put into the drunk tank, a holding cell with three bunk beds where people arrested for DUI were detained to sober up.  *Id.*  at 1421.  Three other inmates were already occupying the bottom bunks, so he had to take a top bunk.  *Id.*

"Shortly after Lancaster was admitted to the jail," and at multiple times throughout the night, his wife and father contacted the jail and officers on duty, and at least one officer who was not on duty, to inform them that if Lancaster began to sober up, he could go into delirium tremens and have seizures.  *Id.* at 1421–23.  They told the officers that he had recently been in the hospital due to seizures and that the last one almost killed him.  *Id.* at 1422.  Lancaster's wife and father wanted to pick him up from the jail and see that he got the care he needed.  *Id.* at 1421–22.  They weren't allowed to do so.

To begin with, Lancaster's wife called the jail shortly after he was admitted and spoke to a dispatcher, warning him that Lancaster "was sick, that he could go into delirium tremens (DTs), and that he would have seizures when the alcohol wore off."  *Id.* at 1421 (footnote omitted).  Her call was then transferred to the jailer on duty, and she informed him that Lancaster had been in the hospital recently with grand mal seizures.  *Id.* at 1421–22.  She also told the jailer that if her husband went very long without alcohol, he would have another seizure, and the last one had almost killed him.  *Id.* at 1422.

After that conversation, Lancaster's father called the sheriff at home and conveyed the same information to him, telling him that Lancaster had seizures before and he "would have a seizure in eight to ten hours if he did not get alcohol or medicine, and that his last seizure had almost killed him." *Id.* The sheriff refused to release Lancaster to his family, but he assured Lancaster's father that he would instruct those at the jail to check on him every fifteen minutes. *Id.* And the sheriff did call the jail and did tell the jailers to "check on Lancaster closely all night." *Id.* But that instruction had little or no effect.

After speaking with the sheriff, Lancaster's family contacted another jail official at his home. *Id.* That official called a jailer (not the one Lancaster's wife had spoken with earlier) at approximately 9:30 p.m. and relayed what the family had told him — "that Lancaster was very sick" and that he "was going to have seizures when he began to sober up, and the jailers needed to keep a close watch on him." *Id.*

The family did not stop there with their efforts to save Lancaster. His father went to the jail and told a jailer he wanted to see his son and get him out of jail. *Id.* The jailer refused to let him even see his son. *Id.* Lancaster's father warned the jailer that his son had seizures, sometimes three to four within seven to ten minutes of each other. *Id.* The jailer promised to look in on him every twenty minutes. *Id.*

At midnight, a new jailer came on duty and was informed by the one he replaced that Lancaster should be kept under close

watch because he "had experienced seizures from alcohol with-drawal in the past and might go into seizures that night." *Id.* at 1423. When that jailer made his rounds that night, he saw that Lancaster was on the top bunk. *Id.*

Around 5:30 a.m. Lancaster's wife "called the jail to find out if [her husband] had experienced a seizure yet." *Id.* She spoke with the jailer who had come on duty at midnight, warning him: "that Lancaster was a chronic alcoholic and would go into DTs"; that he "had been in the hospital about a month before due to seizures"; "that it was approaching time for Lancaster to have a seizure"; and "that Lancaster would need help immediately if he had a seizure." *Id.*

Lancaster's cellmates witnessed Lancaster "visibly shaking" during the night, "climbing across the top bunk beds and trying to get out of his cell through the bars and the ceiling," and saw him having trouble cleaning himself after using the toilet. *Id.* at 1422. Lancaster had complained of headaches and when he got down from his bunk, his cellmates had to help him get back into bed. *Id.*

At approximately 9:30 a.m., Lancaster sat up in his bunk, made a choking noise, was visibly shaking, fell backwards out of his top bunk and landed on the floor, hitting his head. *Id.* at 1423. He began bleeding from his mouth. *Id.* One of his cellmates be-lieved he was having a seizure, and the cellmates yelled for help, but it took at least ten minutes for anyone to arrive. *Id.* A dispatcher had heard their calls for help and walked towards the drunk tank

where she instructed Lancaster's cellmates to turn him on his side. *Id.*

A jailer also arrived at the cell. *Id.* But neither the dispatcher nor the jailer entered the cell to help Lancaster because of a policy that forbade them from entering a cell without a deputy present. *Id.* The dispatcher left to call an ambulance. *Id.* From the time the dispatcher had arrived at the cell until a deputy got there so anyone could enter the cell, seven more minutes elapsed. *Id.* In all, at least seventeen minutes elapsed between the time of Lancaster's serious head injury, when he began bleeding from his mouth and the other inmates started yelling for help, and the time when an officer finally entered Lancaster's cell to help him. *See id.* After he was taken by ambulance to a hospital, he died from an intracranial hemorrhage. *Id.*

The holding of *Lancaster*, framed by and limited to the material facts of that case, as the law requires, is that deliberate indifference (under the negligence-measure standard then in effect) is established where: a pre-trial detainee who was arrested on a DUI offense has a serious medical condition caused by extreme alcohol addiction; the defendant officials are repeatedly warned about the serious condition by multiple family members who have first-hand knowledge of it; the officials are informed that the medical condition will cause the detainee to have delirium tremors and seizures that have almost killed him before, and that pose a serious risk of causing his death when they happen, as they inevitably will; those explicit warnings are given multiple times over a period of more than 12 hours; the defendants refuse to make any effort at all to get

the detainee any medication or medical care, or to release him to the custody of his family who are anxious to see that he is taken care of; and the defendants make no effort to prevent the extremely inebriated man from taking a top bunk from which a fall during the inevitable seizures could well prove fatal, as it did.

That's the holding of *Lancaster* because those are the facts of that case, and regardless of what an opinion says, no holding can extend beyond the facts of the case. *See supra* at 21–24. The holding of *Lancaster* is not that "an official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate" or if the official "intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." 116 F.3d at 1425. Those broad statements are not the holding because they do not include or refer to the specific facts of the case that produced the decision. Those statements from the *Lancaster* opinion extend far beyond the specific and extreme facts of that case and, therefore, are not necessary for the result in it. The holding of *Lancaster* is far more narrow when the case is read against all of the extreme facts that led to the result in the case.

Consider the material differences between this case and the *Lancaster* case. They show how the holding of that case, confined to its facts as it must be, does not fit this case. Because the facts are materially different, the holding in the *Lancaster* case can't have

provided notice to the defendant officers in this case that their actions violated the Constitution, which is required for a denial of qualified immunity on the theory that a "materially similar case" has clearly established the law. *See Davis*, 44 F.4th at 1312; *Griffin*, 496 F.3d at 1209.

In *Lancaster* the defendant officials' delay in seeking medical help for the inmate was more than 12 hours, all of which was spent simply waiting for him to have the serious medical event that was all but certain to occur, and that did occur. *See* 116 F.3d at 1421–23. There was no legitimate purpose in waiting for a predictable, and predicted, bad event to happen; it was delay for delay's sake. *See id.*

In the present case, by contrast, the time between the defendant officers subduing Villegas — who had been violently resisting and attempting to harm them — so they could get him to the location where he could receive the best medical treatment reasonably available was five minutes and 23 seconds. Five-and-a-half minutes spent getting an inmate to a medical treatment room is not twelve hours spent just waiting for a highly predictable and repeatedly predicted medical calamity to happen. That is a stark contrast.

Even more starkly contrasting is how the officers used the time. In *Lancaster* there was no legitimate reason for the twelve-hour delay in obtaining medical care for the seriously ill inmate. None. In the present case, by contrast, the defendants did not stand around waiting for twelve hours or even twelve minutes. When they finally got Villegas restrained, they immediately rushed him

to the nearest treatment room, getting him there as fast as they could.  And unlike the defendant officers in *Lancaster*, these officers did not have twelve hours to think about what to do; instead, they decided what to do, as they had to, immediately and on the spot in the midst of an emergency medical event.  *Cf. Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007) (noting that "we are loath to second-guess the decisions made by police officers in the field" because "officers are often forced to make split-second judgments . . . in circumstances that are tense, uncertain, and rapidly evolving") (alteration adopted) (quotation marks omitted).

    And the difference in motive or purpose provides another stark contrast between *Lancaster* and this case.[5]  We examine the subjective mind state of the defendant officers to determine whether they were actually aware that their actions put the inmate at a substantial risk of serious harm.  *See Wade*, 106 F.4th at 1255; *Farmer*, 511 U.S. at 837–38.  The officers in this case reasonably believed that Villegas would receive better healthcare in the medical treatment room in F-dorm, which had better facilities, equipment, and personnel than in E-dorm where Villegas had acted out violently and been subdued.  Lieutenant Milton Gass, a defendant

---

[5] As will soon be discussed in more detail, courts should and do consider the reason for the alleged delay of medical care when determining whether it amounts to deliberate indifference.  *See infra* at 42–45 (citing *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015); *McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir. 1999); *Youmans*, 626 F.3d at 566 n.11; *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985)).

officer, testified that they moved Villegas to F-dorm because they believed that once there he would have access to "further medical equipment," could receive supplemental oxygen, and there was an "on-call doctor" in that location. It was not unreasonable for the officers to believe that, and nothing in *Lancaster* establishes, much less clearly establishes, that it was.

As the district court pointed out, the officers got Villegas to the F-dorm medical treatment room "promptly." To say the least. Once they got him strapped safely into a wheelchair, they rushed him to the medical treatment room at F-dorm — "[a]lmost at a running pace," so fast that the nurses outside E-dorm were "running" to keep up with them, as Nurse Paula Fischer testified. The officers were rushing Villegas to the better medical facility because they were attempting to save him. There is no other explanation for why they were in such a hurry to get Villegas to the medical facility. As Lieutenant Gass explained: "[O]ur intent [was] to get him there as soon as possible to render him treatment so that he w[ould] be okay . . . ." That is action fueled by deliberate concern, which is the opposite of inaction and deliberate indifference.

By contrast, there was no apparent benevolent motive in *Lancaster* where the defendant officers did not rush the inmate anywhere, but instead detained him for more than 12 hours, rebuffing the pleas of his family, while those officers waited for the almost-certain-to-happen life-threatening medical event to occur, which it did. *See* 116 F.3d at 1421–23.

The dissenting opinion emphasizes that, while transporting Villegas to the treatment room, the officers in this case paused for approximately twenty-five seconds to replace the torn spit shield covering Villegas's face.  *See* Dissent at 14, 21–22.  But no case holds that it is unreasonable for officers to take less than half-a-minute to protect themselves from an inmate who had just moments before engaged in extremely aggressive behavior and strenuously fought them.  Before rushing him to medical care, the officers had to struggle to restrain Villegas, a 275-pound man who was on K2 (a synthetic cannabinoid) and was "violently resisting" them with "superhuman" strength like that of a "grizzly bear" and "literally was lifting [the officers]."

The use of a spit shield was especially appropriate because during the fierce fight Villegas had been attempting to bite and spit at the officers.  Spitting by itself presented a health risk.  LPN Tammy Spencer explained that "a lot of inmates have HIV" or "hepatitis," and "you don't want that in your face."  And biting presented even more of a risk.  No decision, including *Lancaster*, clearly establishes that it is unreasonable for officers in these circumstances to take twenty-five seconds to put a spit shield between themselves and an inmate who had immediately before attempted to spit on and bite them.[6]

---

[6] The dissent accuses the defendant officers of "twice actively preventing the nurses" from approaching Villegas to administer medical care.  Dissent at 22; *see also id*. at 8, 13, 17, 18, 23.  That mischaracterizes the facts, and in any event

would not establish that the defendants had the subjective mindset required for a deliberate indifference claim.

One of the times that my dissenting colleague thinks the officers "actively prevented" the nurses from attending to Villegas, is when the officers passed the nurses in the hallway outside E-dorm while they were on their way to the F-dorm treatment facility. *See* Dissent at 13. Nurse Fischer testified that as she approached Villegas in the wheelchair, one officer told her to "stop and back up." To the extent the officers "prevented" Nurse Fischer from providing care at this time, they did so only because they were in the middle of obtaining another form of care for him, by rushing Villegas at high speed to the medical treatment room they believed was best equipped to treat him. *See infra* at 33–36. Stopping to allow a nurse to check Villegas now would have delayed his arrival at that better facility. (Perhaps if they had done so, that delay would have been the basis of the plaintiff's deliberate indifference suit.) There is no evidence in the record to support the view that the officers had enough knowledge about emergency medical treatment that they could have known to prioritize a quick hallway check over transport to a medical treatment room, especially given that it occurred in a high-pressure, fast-moving emergency. *See infra* at 47–50.

As for the second time that the dissent believes the officers "actively prevented" the nurses from treating Villegas, apparently that refers to the 25 seconds during this same dash down the hallway when the officers stopped to replace Villegas' spit shield. *See* Dissent at 14, 22. As I have explained, it was not deliberate indifference for the officers to do that. *See supra* at 36. And the record does not show that the officers "prevented" the nurses from treating Villegas in that moment. The nurses got the impression that they weren't "allowed" to approach Villegas, but they did not testify that they asked for and were denied permission to access Villegas during those 25 seconds. Nor is there evidence that the nurses tried to approach him at that time and that the officers physically stopped them.

Anyway, whether the officers briefly "prevented" the nurses from access to Villegas is beside the point. They prioritized safety by equipping Villegas with a spit shield, and they prioritized speed by doing so quickly and then

The *Lancaster* decision, read against the extreme and materially distinguishable facts of that case, does not establish — much less clearly establish — that what the defendants in this case did in their effort to get Villegas medical treatment quickly was deliberately indifferent. It is the law of this circuit that a case that is fairly distinguishable from a later one cannot control the later one, much less clearly establish the law in a way that rules out qualified immunity in the later case. *See, e.g., Davis*, 44 F.4th at 1312; *Griffin*, 496 F.3d at 1209; *Vinyard*, 311 F.3d at 1352.

And that independently adequate reason is in addition to the other reason: *Lancaster* was decided when panels of this Court were required to apply a different standard of deliberate indifference —

---

rushing on to the medical treatment room without pausing. Those facts do not show that they were "subjectively aware that [their] own conduct . . . put the plaintiff at substantial risk of serious harm." *Wade*, 106 F.4th at 1258.

The dissent also refers to the fact that earlier the officers had ordered the nurses out of the E-dorm common area when they moved Villegas — who was still violently resisting — out of his cell. *See* Dissent 10. It was unsafe for the nurses to approach Villegas at this time; the officers didn't *prevent* medical attention. *See* Majority Op. at 6–8. Nurse Fischer herself testified that it would have been unsafe for her to treat Villegas at that time and that trying to do so would "absolutely not" have been appropriate.

And the dissent notes the Chief Deputy Medical Examiner's opinion that once Villegas was in his wheelchair in E-dorm, that would have been a good time for the nurses to evaluate him. *See* Dissent at 11–12. But the officers did not "prevent" care by immediately transporting Villegas to F-dorm instead of summoning the nurses; they made that split-second decision in the urgent, high-pressure circumstances that they faced.

a negligence-based measure instead of one measured by criminal recklessness.

## B. The *Bozeman* Decision

The dissent also relies on *Bozeman v. Orum*, 422 F.3d 1265 (11th Cir. 2005). *See* Dissent at 3–6. In that case, prison officers used physical force to subdue a prisoner in his cell. 422 F.3d at 1268–69. (It was enough force, in fact, to render the prisoner unconscious even after he had surrendered, leading us to reject the officers' qualified immunity defense on excessive-force claims. *Id.* at 1271–72.) With the prisoner apparently "lifeless" — not making any "movements or sounds" and with his "body h[anging] and flopp[ing] in an uncontrolled manner" — the officers took fourteen minutes to carry him to an isolation cell. Not to a medical treatment room, but to an isolation cell. *Id.* at 1269–70. Only after they had arrived at the isolation cell and were "wait[ing] for [it] to be prepared" did the officers "notice[] that [the prisoner] appeared unconscious" and only then did they call for medical help. *Id.* at 1270.

In assessing the *Bozeman* officers' qualified immunity defense, we noted the rarity with which a "general principle" will clearly establish the law in an Eighth Amendment deliberate indifference case. After quoting the language from *Lancaster* on which the dissenting opinion in this case relies, we explained:

> *This general statement of law ordinarily does not preclude qualified immunity in cases involving a delay in medical treatment for a serious injury. The cases are highly fact-specific and involve an array of circumstances* pertinent to

>just what kind of notice is imputed to a government
>official and to the constitutional adequacy of what
>was done to help and when.  Most cases in which de-
>liberate indifference is asserted are far from obvious
>violations of the Constitution.

*Id.* at 1274 (emphasis added).  But *Bozeman* was the rare case where
"the assumed circumstances . . . [were] stark and simple, and the
decisional language from cases such as *Lancaster* obviously and
clearly applie[d] to the extreme circumstances" in *Bozeman*: "the of-
ficers knew [the prisoner] was unconscious and not breathing and
— for fourteen minutes — did nothing." *Id.*  That's a key fact.  The
officers did *nothing at all*.  Given those extreme circumstances, they
violated clearly established Eighth Amendment law (under the
negligence measured deliberate indifference standard in effect at
that time).  *Id.*

None of that is true here.  Villegas did not appear "lifeless,"
*cf. id.* at 1269–70; he was still noticeably breathing while the officers
moved him to the F-dorm treatment room.  And the officers did
not do "nothing" or waste critical minutes by moving Villegas to
an isolation cell lacking any medical resources.  *Cf. id.* at 1270, 1274.
Instead, they rushed him directly to the medical treatment room
best equipped to provide him with care.  In comparison to the four-
teen minutes of delay in *Bozeman*, there was no delay in this case:
the officers prepared Villegas to move and then, in five-and-a-half
minutes of nearly running with him in a wheelchair, they rapidly

moved him to the place where he could receive the best available care.

This case is far less like *Bozeman* than *Pourmoghani*, a case in which we held that a jail official was not deliberately indifferent where a detainee signaled for help and "the response . . . occurred promptly," i.e., "within approximately five minutes." 625 F.3d at 1318. We explained that "[t]he term 'delay' hardly seems to fit the facts at all; but to the extent that one could call the time involved in this case 'delay,' it was only a matter of minutes." *Id*. The same is true here.

With its materially distinguishable facts, *Bozeman* cannot clearly establish that the officers' actions in this case constituted deliberate indifference. *See, e.g.*, *Davis*, 44 F.4th at 1312; *Griffin*, 496 F.3d at 1209; *Vinyard*, 311 F.3d at 1352; *see also* Majority Op. at 21–25. And that, again, is in addition to the independently adequate reason that it was decided under a lower bar deliberate indifference standard than the one applicable to this case.

## C.  The *Valderrama* Decision

The dissent also relies on *Valderrama v. Rousseau*, 780 F.3d 1108 (11th Cir. 2015). *See* Dissent at 6–8. But the facts of that case are even further off the mark than the other cases the dissent puts forward.

In *Valderrama*, Detective Rousseau pulled over a car, approached it, and apparently without any justifiable reason shot an unarmed passenger "in his groin area," inflicting "a close range

gunshot wound." 780 F.3d at 1116, 1117 n.7. The bullet penetrated the man's penis, exited his scrotum and one testicle, entered his thigh, and exited just below his buttock. *Id*. at 1110. The injuries were life-threatening. *Id*. at 1122. The man, who was bleeding profusely through his clothing, thought he was going to die and begged Sergeant Yasmina Smith, who was also at the scene, to call an ambulance for him. *Id*. at 1117 & n.7. Instead, she told him to sit down. *Id*. at 1117.

After a three-and-a-half-minute delay, Sergeant Smith did call an ambulance but she lied to the dispatcher, stating that the injury was "ahh, a laceration," meaning a cut, instead of a gunshot wound. *Id*. at 1111. As we explained in the *Valderrama* opinion, "[g]iven the minor injuries generally associated with lacerations, fire and rescue dispatch assigned the call the lowest priority," which resulted in it taking "eleven minutes for the ambulance to arrive after Sergeant Smith reported the laceration." *Id*.

If she had told the dispatcher the truth and reported the injury as a gunshot wound, "the request would have received the highest priority, and an ambulance would have arrived within four minutes of the call" instead of the eleven minutes it took. *Id*. In that way Sergeant Smith delayed the seriously wounded and bleeding man getting medical care by seven additional minutes, running the total unnecessary delay up to ten-and-a-half minutes. *See id.*

As bad as that is, the length of the unnecessary delay in *Valderrama* is not the worst of it in that case. The reason for the delay is. We have held that "the reason for the delay and the nature of

the medical need is relevant in determining what type of delay is constitutionally intolerable." *Id.* at 1116 (quoting *McElligott,* 182 F.3d at 1255); *accord Youmans*, 626 F.3d at 566 n.11; *Goebert*, 510 F.3d at 1327 (In deciding whether delay in providing medical care amounts to deliberate indifference, "we have consistently considered . . . the reason for the delay."); *cf. Ancata*, 769 F.2d at 704 (11th Cir. 1985) (concluding prison officials were deliberately indifferent when "necessary medical treatment ha[d] been delayed for non-medical reasons").

In the *Valderrama* case, the reasons for the delay in obtaining medical assistance were not just bad but were of the worst sort. As we stated in the opinion in that case:

> Based on the evidence, a jury could infer that Detective Rousseau and Sergeant Smith spoke about the shooting before calling for assistance and that they discussed the need to concoct a story that would justify Detective Rousseau's use of deadly force and, therefore, complicitly delayed reporting and misreported Mr. Valderrama's injuries in order to delay the arrival of emergency personnel on the scene.

780 F.3d at 1118. That explains the otherwise inexplicable lie that Sergeant Smith told the dispatcher about the nature of the wound. *See id.* at 1118–20. The two officers intentionally delayed getting medical personnel to the scene where a badly wounded and bleeding man desperately needed help and they did so to advance their own unworthy interests. *See id.*

44                    CARNES, J., Concurring                    22-10881

A jury could find from the evidence in *Valderrama* that during the delay which the two officers deliberately engineered, and while the victim of the shooting was bleeding from his life-threatening gunshot wound, Detective Rousseau did his best to concoct a story that would cover up his wrongdoing.  *See id*.  He unsuccessfully searched the car the victim had been in, attempting to find any object that he could say he had mistaken for a firearm when he fired the shot. *Id*. at 1118–19.  He found none.  *Id*.  And even worse, Rousseau used some of the delay time he had given himself at the expense of the badly wounded victim, trying to convince another man he had arrested on drug charges earlier, and who was still in the backseat of Rousseau's police car, to lie for him.  *Id*. at 1111, 1118–19.  He told the man if he would falsely say that he'd seen a shiny, metallic object in the victim's hand at the moment Rousseau shot him, Rousseau would dismiss the charges against the man. *Id*. The man turned down the offer.  *See id*. at 1118–19.

The present case is glaringly different from the *Valderrama* case.  Unlike the officers in *Valderrama*, the officers in this case did not "seek to protect themselves from the potential legal and professional ramifications of injuries inflicted by one of the officers while an arrestee bleeds through his clothing from a gunshot wound" that one of them had inflicted. *Id*. at 1122–23.  The officers in this case did not lie about anything, and they didn't ask an arrested suspect to lie for them.  They didn't seek to cover up any wrongdoing, and they didn't slow walk any needed medical care or intentionally delay providing it.

Instead, these officers did what they could to get Villegas to what they believed was the best medical care and treatment room reasonably available for him. And they didn't take their time doing so. There was no slow-poking it along, no stalling for time, but a quick dash to what they believed to be better medical treatment.

All of that makes this case obviously distinguishable from the *Valderrama* case, which means that even if that case had been decided in the post-*Wade* era with its different deliberate indifference standard, it still could not be binding precedent that the officers' actions in this case amounted to deliberate indifference, much less to deliberate indifference under clearly established law. *See, e.g.*, *Davis*, 44 F.4th at 1312; *Griffin*, 496 F.3d at 1209; *Vinyard*, 311 F.3d at 1352; *see also* Majority Op. at 21–25.[7]

---

[7] The dissent quotes the part of *Valderrama* that quotes from *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990), this sentence: "[I]t *may be* that deliberately indifferent delay, no matter how brief, would render defendants liable as if they had inflicted the pain themselves." Dissent at 7–8; *Valderrama*, 780 F.3d at 1122; *Brown*, 894 F.2d at 1538 (emphasis added). The dissent argues that we should treat that statement as a broad principle of law. *See* Dissent at 7–8; *see also id.* at 8 n.2, 18, 23. But that explicitly speculative and conjectural statement ("may be") is dicta. The statement is dicta because it was in no way necessary to the decision of the *Brown* case; it wasn't necessary because the delay in that case was not at all brief but was "on the order of hours." *See* 894 F.2d at 1538 ("*Even if we were to recognize* as de minim[i]s delays of a few seconds or minutes, *a deliberate delay on the order of hours* in providing care for a serious and painful broken foot is sufficient to state a constitutional claim.") (emphasis added). Not only that, but the delay of hours in *Brown* was deliberate. *Id.* at 1538–39.

None of our decisions that have repeated the "may be" conjectural dicta from *Brown* actually held that a delay of a few minutes was deliberate

46                    CARNES, J., Concurring                    22-10881

The dissent cites a few more deliberate indifference deci-sions, but like the ones already discussed, those decisions were de-cided during the pre-*Wade* negligent standards era and are all fac-tually distinguishable from this case anyway.[8]    They cannot

indifference.  *See generally, e.g., Melton v. Abston*, 841 F.3d 1207, 1222–33 (11th Cir. 2016) (involving multiple medical care providers and officials who knew about the incarcerated plaintiff's injury *for months* but failed to obtain treat-ment); *McElligott*, 182 F.3d at 1251–61 (involving medical care providers who "basically did nothing to alleviate [the incarcerated plaintiff's] pain, essentially letting [him] suffer even as his condition was deteriorating" where the plaintiff had continually complained about symptoms, including extreme abdominal pain, *for six months* without receiving care).

What the plaintiff and dissent call "delay" in this case was not deliber-ate, nor did it last "on the order of hours" as the delay in *Brown* did.  *See* 894 F.2d at 1538.  It doesn't deserve to be called "delay."  The officers who trans-ported Villegas to the F-dorm, at a near-racing pace, did not delay getting him to medical treatment.  Instead, they intentionally got him to F-dorm where there was better medical care as fast as they reasonably could, pausing only twenty-three seconds to put a spit shield back on Villegas to protect them-selves.  The *Valderrama* opinion itself states (in dicta) that even a "a three and half minute delay standing alone may be insufficient to establish deliberate in-difference."  780 F.3d at 1120.

For all of these reasons, *Brown* is clearly distinguishable and cannot be used to establish that there was deliberate indifference here, much less that it was clearly established for qualified immunity purposes that there was delib-erate indifference here.  *See supra* at 8–12, 22–24.  And that would be true even if *Brown* had been decided under the post-*Wade* deliberate indifference stand-ard.

[8] Only four of those cases the dissent cites actually denied qualified immunity. *See Nelson v. Tompkins*, 89 F.4th 1289, 1297–1300  (11th Cir. 2024) (concluding that a jail official who failed to "prevent the placement of a white detainee alone in a cell with another detainee who, the day before, stabbed a stranger

support a denial of quality immunity.  *See Davis*, 44 F.4th at 1312; *Griffin*, 496 F.3d at 1209.

## VI. This is Not a Medical Malpractice Case

The dissent says that the "issue at hand" is the officers' "fail[ure] to provide any assessment or medical care and refus[al] to allow the nurses to even see Mr. Villegas."  Dissent at 20.  But that is neither the issue nor an accurate reflection of the facts.  The officers did not fail to provide Villegas with medical care by immediately rushing him to what the officers believed to be the better equipped and better staffed F-dorm medical treatment room.  They just did not provide the precise type of medical care the dissent now prescribes for them based on alleged professional medical knowledge that the officers did not have.

---

solely for being white" (which the jail official knew) was not entitled to qualified immunity after the other detainee killed the white detainee); *Goebert*, 510 F.3d at 1329–31 (rejecting the qualified immunity defense of a jail administrator who "had reason to know that [a detainee . . .] had a serious medical problem that needed attention, but . . . chose to disbelieve, without investigation, everything [the detainee] said simply because she was an inmate," which delayed needed treatment for "approximately one day" for "no good reason"); *Cottone v. Jenne*, 326 F.3d 1352, 1358–60 (11th Cir. 2003) (affirming the denial of qualified immunity to jail officials for deliberate indifference where they declined to monitor a schizophrenic detainee who was known to be violent and was housed with another detainee, whom he killed); *Harris v. Coweta County*, 21 F.3d 388, 393–94 (11th Cir. 1994) (rejecting the qualified immunity defense of a sheriff who delayed care for "several weeks").  In all of four of those non-binding, pre-*Wade* cases, the defendants subjectively knew facts allowing them to understand the seriousness of their situations, that they were putting the detainee or inmate in substantial danger, and they chose to do it.

The plaintiff framed this case, in large part, as a medical mal-practice case and presented expert opinion evidence from medical professionals.  If the defendants were doctors in a medical malprac-tice suit, the issue would be whether their rushing Villegas off to the better equipped and staffed F-dorm treatment room breached "the prevailing professional standard of care for [a] health pro-vider," which in Florida requires "the level of care, skill, and treat-ment which . . . is recognized as acceptable and appropriate by rea-sonably prudent similar health care providers."  Fla. Stat. Ann. § 766.102(1).

But none of the defendant officers is a doctor or even a nurse.  And this is not a medical malpractice case.  It is not a negli-gence case of any kind — remember that *Wade* jettisoned the "more than negligence" and "more than gross negligence" stand-ards in favor of a criminal recklessness standard.  106 F.4th at 1254–55, 1257, 1261.  Because *Wade* did that, this is a *non*-negligence, *non*-gross negligence, *non*-medical malpractice, deliberate indifference issue case.  What counts is not what the plaintiff's experts know about medicine, and what reasonably prudent medical experts would have done, or what in their expert opinion someone should have done, but what the laymen correctional officer defendants knew at the time.

The defendant officers, of course, did not know about med-icine what Dr. Hughes, with his medical degree and 22 years of medical practice, knew.  They did not know what Dr. Lavezzi, the Deputy Chief Medical Examiner, with her medical degree and 15

years of experience as a nurse before she became a doctor, knew. They did not know what Nurse Fisher, with her 12 years of experience, knew. And they did not know what Nurse Spencer, with her 32 years of experience, knew.

Not only that, but the defendant officers did not have the luxury of time that the plaintiff's medical experts had to research and decide what should be done. Dr. Hughes, for example, spent at least eight hours preparing to testify about what the officers should have done in the moments they had to react to the medical emergency. And at least four of those eight hours that Dr. Hughes took were for an "initial review" that included consulting articles in learned journals, such as the *Journal of Toxicological Sciences,* the journal *Medicine*, and publications by medical organizations like the National Commission on Correctional Healthcare and the American Heart Association. Yet the dissent faults the officers for deciding on the spot and under dire time pressures to rush Villegas to the nearest medical treatment room. One can imagine what the reaction would have been if the officers had spent hours seeking to locate and read learned journals and publications before deciding what to do.

My dissenting colleague also cites the nurses' testimony that it would have been safe for them to treat Villegas before or during the rushed transport to the medical treatment room. *See* Dissent at 20. But he cites no evidence indicating that they communicated that professional judgment to the officers who were reacting to the medical emergency.

It would be grossly unfair, to say nothing of legally un-founded, to judge corrections officers against the medical knowledge of doctors and nurses with eight decades of combined medical experience. If we used the knowledge and experience of doctors and nurses to critique and find fault with the actions of corrections officers who had to make an urgent decision immediately after they had been attacked by and struggled to restrain a drug-crazed, 275-pound inmate, we would be committing judicial malpractice.

Because this is not a medical malpractice case, "the issue at hand," to use the dissent's phrase, Dissent at 20, is not best medical practices or the prevailing standard of care in emergency medicine. This is a case involving a deliberate indifference claim against corrections officers protected by the doctrine of qualified immunity, to be decided under the prevailing law.[9]

---

[9] The final words of the dissent, carried in a footnote, *see* Dissent at 24 n.7, are a call for the repeal of the doctrine of qualified immunity, which would do away with more than 50 years' worth of Supreme Court precedent and render obsolete decisions in every circuit across the country, numbering in the hundreds if not thousands. *See generally Pierson v. Ray*, 386 U.S. 547, 555–57 (1967) (founding the qualified immunity doctrine); *see Acoff v. Abston*, 762 F.2d 1543, 1549 (11th Cir. 1985) (citing decisions on qualified immunity and listing *Pierson* as the earliest); *Scott v. Dixon*, 720 F.2d 1542, 1547 (11th Cir. 1983) (citing *Pierson* for application of "qualified immunity"); *Quarles v. Sager*, 687 F.2d 344, 346 (11th Cir. 1982) (same); *see also, e.g., Thorpe v. Clarke*, 37 F.4th 926, 939 (4th Cir. 2022) (stating that *Pierson* "found[ed] the qualified-immunity doctrine"). That seems to be more than a little inconsistent with the dissent's protests against

### VII.    The Death Certificate

The dissent emphasizes that Dr. Lavezzi, the Deputy Chief Medical Examiner, wrote in Villegas' autopsy report that the "manner" of his death was a "homicide." *See* Dissent at 14, 17, 23. But her use of the word "homicide" does not find, imply, or even hint that the defendants were deliberately indifferent to Villegas' medical needs.

Lavezzi testified that she defines "homicide" as "death as a result of an intentional act by another human being." Asked what facts led her to label Villegas' death a homicide, she pointed to her understanding that "there was a struggle with someone," and she identified "that struggle [as] the intentional act." She noted that the term "homicide" can be used where someone "inadvertently and carelessly" does something and "there is some kind of an altercation involved." In Villegas' case, she said, "[t]here is clearly an altercation here resulting in death." The "altercation," of course, was the horrendous struggle that ensued from Villegas, a 275-pound man, becoming crazed and uncontrollable on the drug K2 and "violently resisting" the officers with "super-human" strength like that of a "grizzly bear" and "lifting [the officers]," and attempting to spit on and bite them.

––––––––––––––––––––––––

what it views as my interpretation of *Wade* "do[ing] away with 30 years of Eleventh Circuit deliberate indifference precedent." Dissent at 18–19 n.5. Perhaps it depends on one's view of the precedent being done away with.

Lavezzi's definition of homicide was a "medicolegal definition[]" (that is, one involving both law and medicine) and "not a legal definition." The use of that term did not mean that there was deliberate indifference or a criminal act of any kind by any defendant officer. There wasn't.

### VIII. Application of Pressure to Villegas' Body

Even though it has little or nothing to do with the one claim that is before us in this appeal, the claim involving the alleged delay in providing medical care, the dissent argues that the officers applied downward pressure on Villegas' head, neck, and shoulders as they moved him to the F-dorm. Dissent at 12–13, 21–22. That fact does not move the needle toward deliberate indifference in obtaining medical assistance. The plaintiff's operative complaint does not rely on that alleged conduct to support the deliberate indifference claim. And no wonder it doesn't. Use of force to restrain a violent inmate who is fighting them before they are finally able to restrain him does not indicate that the officers delayed medical care with a mental state of deliberate indifference.

In any event, we have to analyze the officers' subjective mentality from the perspective of facts actually known to them. *See Wade*, 106 F.4th at 1255; *Farmer*, 511 U.S. at 837–38. What the officers knew was that Villegas was a large man who had recently been violent. Officer Alan Perrotta, one of the defendants, testified that the purpose of putting "downward pressure on his shoulders" was to "prevent him from lifting [or] flailing back" and to "prevent[] him from being able to move" too much. That was standard

procedure: "[W]e always have to have hands on [an inmate in a wheelchair] to prevent him from falling out of the wheelchair." Major Shawn Lee similarly explained that multiple officers continued to hold Villegas down even after he had been restrained "[b]ecause of the size of the inmate and the violence that's occurred."

Fischer, one of the nurses who ran after the officers as they transported Villegas to F-dorm, also understood that they were holding Villegas down in the wheelchair because, as she recounted, they were "being cautious that he doesn't rise up and try something." It is not deliberate indifference to hold down a prisoner, who has demonstrated he is capable of great violence, while moving him to receive medical care.

The officers' application of pressure is relevant to the excessive force claim, but as the majority opinion points out, Stalley forfeited any challenge to the district court's grant of summary judgment against him on his excessive force claim by not raising it in this appeal. *See* Majority Op. at 19 & n.10.

## IX. Conclusion

The majority decision is correct to affirm the grant of summary judgment to the defendant officers on the plaintiff's deliberate indifference claim against them in this case.

JORDAN, Circuit Judge, Dissenting:

A prison official violates the Eighth Amendment "if he knows that [an] inmate[ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). *See also Wade v. McDade*, 106 F.4th 1251, 1261 (11th Cir. 2024) (en banc) (explaining that a "deliberate-indifference plaintiff must demonstrate that the defendant was actually aware that his own conduct caused a substantial risk of serious harm to the plaintiff"). This case involves a delay-of-care claim, so I begin with the general standard governing such a claim.

## I

More than 25 years ago, applying *Farmer*, we said this about an Eighth Amendment claim by a prisoner alleging deliberate indifference by an official who delayed in providing him with medical care:

> [T]he case law [as of 1995] had made it clear that an official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate . . . .
>
> The case law also had clearly established before this case arose that an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an

urgent medical condition that would be exacerbated
by delay . . . .

*Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1425 (11th Cir. 1997) (citations omitted) (holding that a county sheriff and jailers were not entitled to qualified immunity in action brought by the estate of a pretrial detainee who died in custody because they acted with deliberate indifference—they knew that the detainee was a chronic alcoholic who had an urgent medical condition (he went into seizures when the alcohol wore off) that could be worsened by delay but nevertheless delayed in obtaining the treatment until after the inmate suffered a seizure).   This delay-of-care standard has been confirmed and reaffirmed in a number of our subsequent cases. *See, e.g., Nam Dang v. Sheriff, Seminole Cnty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) ("Even when medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs."); *Harris v. Coweta Cnty.*, 21 F.3d 388, 393 (11th Cir. 1994) ("At the time of Harris' incarceration [in 1990–91], it was clearly established that knowledge of the need for medical care and intentional refusal to provide that care constituted deliberate indifference. Delay in treatment of serious and painful injuries was also clearly recognized as rising to the level of a constitutional claim.") (citation omitted).

Our circuit has a number of factually similar delay-of-care cases which apply the deliberate indifference standard set out in

*Lancaster*.  I'll discuss two of those cases, and quote them heavily, because of their relevance here.[1]

In *Bozeman v. Orum*, 422 F.3d 1265 (11th Cir. 2005), a pretrial detainee "appeared to be lifeless" following a 20-minute altercation with correctional officers at a detention facility.  Five correctional officers, after shackling the detainee, spent 14 minutes taking him to an isolation cell on another level of the facility.  Only when they arrived there, and the detainee seemed "unconscious," did the officers call for a nurse, who arrived two minutes later.  The nurse tried life-saving techniques, and paramedics came shortly thereafter, but the detainee died.  *See id.* at 1269–70.

Viewing the evidence in the light most favorable to the detainee's estate, we held that a jury could find that the five officers acted with deliberate indifference by failing to promptly seek medical assistance for the detainee:

> We conclude that the record evidence would authorize a jury to find that [the detainee] was unconscious and not breathing while being carried by the Officers from his cell to the 4 North corridor and to find that [his] condition was known to the Officers. While a jury may ultimately decide the facts differently, one can reasonably infer that the Officers—in occupying

---

[1] Both of the cases involved deliberate indifference claims brought by pretrial detainees under the Due Process Clause, but they constitute binding precedent here because "the standards under the Fourteenth Amendment are identical to those under the Eighth." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).

such close proximity with [the detainee] as they carried him—would have recognized what other eyewitnesses consistently testified was obvious to them: that [he] was unconscious and not breathing. That the Officers—throughout the time the inmates all testified [he] appeared lifeless—physically handled [him] for about fourteen minutes, set him down while some of the Officers tried to open a locked door en route, and looked panicked, supports this inference. In addition, one Officer kept exclaiming, "damn, damn, damn"; and the videotape confirms that, during a portion of the Officers' trek with [the detainee], [he] was motionless with his head dangling.

We also conclude that the Officers, who knew [the detainee] was unconscious and not breathing and who then failed for fourteen minutes to check [his] condition, call for medical assistance, administer CPR or do anything else to help, disregarded the risk facing [him] in a way that exceeded gross negligence. "The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay." *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994). A delay in care for known unconsciousness brought on by asphyxiation is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes. Still, the right reason for the delay can make a delay of any duration tolerable.

*Id.* at 1273.

We then held that the officers were not entitled to qualified immunity:

> "[A]n official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997) . . . This general statement of law ordinarily does not preclude qualified immunity in cases involving a delay in medical treatment for a serious injury. The cases are highly fact-specific and involve an array of circumstances pertinent to just what kind of notice is imputed to a government official and to the constitutional adequacy of what was done to help and when. Most cases in which deliberate indifference is asserted are far from obvious violations of the Constitution.
>
> But the assumed circumstances here are stark and simple, and the decisional language from cases such as *Lancaster* obviously and clearly applies to these extreme circumstances: the officers knew [the detainee] was unconscious and not breathing and—for fourteen minutes—did nothing. They did not check [his] breathing or pulse; they did not administer CPR; they did not summon medical help. Given these circumstances, we conclude that the Officers were fairly warned by our case law and that the Officers' total failure to address [the detainee's] medical need during the fourteen-minute period violated [his] constitutional rights, which

violation should have been obvious to any objectively
reasonable correctional officer.

*Id.* at 1273–74 (some citations omitted).

In *Valderrama v. Rousseau*, 780 F.3d 1108 (11th Cir. 2015), two
police officers delayed for three and a half minutes before calling
an ambulance for an individual whom one of them had shot in the
groin and was bleeding profusely, and then delayed the arrival of
that ambulance by another seven minutes by reporting the injury
as a laceration instead of a gunshot wound.  *See id.* at 1110–11.  We
explained that the individual "d[id] not necessarily need to show
that the delay in medical care exacerbated his condition because
the delay in care is, itself, a wanton infliction of pain and a consti-
tutional violation."  *Id.* at 1116.

We then held that a jury could find that the officers acted
with deliberate indifference: "While a three and half minute delay
standing alone may be insufficient to establish deliberate indiffer-
ence, under the facts of this case, a reasonable jury could conclude
that Sergeant Smith and Detective Rousseau were more than
grossly negligent when they delayed [the arrestee's] medical care
for more than ten minutes for no good or legitimate reason as he
faced life-threatening injuries."  *Id.* at 1120.

Finally, relying in part on the standard set out in *Lancaster*,
we held that the officers were not entitled to qualified immunity
despite the lack of a prior case "on all fours:"

We next address whether the constitutional right that
Detective Rousseau and Sergeant Smith violated was

clearly established on the date of the incident so that it would have been reasonably clear to an officer that Sergeant Smith's and Detective Rousseau's conduct was unlawful. We conclude that it was. As we previously have explained, it is "clearly established . . . that an official acts with deliberate indifference when he intentionally delays providing . . . access to medical treatment, knowing that the [arrestee] has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." *Lancaster v. Monroe Cnty., Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997). Under this authority, it was clearly established that when officers intentionally delay seeking treatment for a life-threatening injury, they act with deliberate indifference.

Nonetheless, the officers argue that this general statement alone is insufficient to establish that they acted with deliberate indifference given the specific facts of this case. Even accepting the officers' argument that more specificity is required, however, it was still clearly established that the officers acted with deliberate indifference here. Though we recognize that there is no case "on all fours" with the facts before us, this is a case in which the principles from relevant precedents were clear enough that the officers had notice. We have warned that delays even of only a "few minutes" in seeking care for life-threatening injuries can constitute deliberate indifference. *Bozeman*, 422 F.3d at 1273; *see also Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (explaining that with serious and painful injuries, "it may be that deliberately

indifferent delay, no matter how brief, would render defendants liable as if they had inflicted the pain themselves"). These prior cases provided Sergeant Smith and Detective Rousseau with a "reasonable warning that the conduct at issue violated constitutional rights."

*Id.* at 1121–22 (footnote and some citations omitted).[2]

I ask readers to keep *Bozeman* and *Valderrama* in mind as they consider what happened to Mr. Villegas here.

## II

As the magistrate judge concluded in his report and recommendation, there is more than enough evidence here to deny summary judgment on qualified immunity grounds to the correctional officers who failed to provide medical assistance to Mr. Villegas when he was restrained and completely unresponsive and who prevented nurses from examining him. *See* D.E. 83 at 20–30. In my view the majority errs in concluding otherwise.[3]

---

[2] The majority seeks to distinguish *Bozeman* and *Valderrama* on their facts, but does not address the core contention of *Valderrama*—that in a delay-of-care case involving a life-threatening condition, a prior case directly on point is not needed to provide fair notice.

[3] I recognize that "[b]ecause § 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation, each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018) (citations and internal quotation marks omitted). Here, though, the correctional officers themselves chose to challenge

22-10881                JORDAN, J., Dissenting                9

Even in a qualified immunity setting, we view the evidence at summary judgment—much of which, in this case, comes from prison videos—in the light most favorable to Douglas Stalley, the personal representative of Mr. Villegas' estate. *See Tolan v. Cotton*, 572 U.S. 650, 655–60 (2014). Seen through that prism, here's what the record shows.[4]

When Sergeant Henry Fender and Officer Dalton Tifft found Mr. Villegas lying unresponsive in his cell at the Lake Correctional Institution, two nurses—Paula Fischer and Tammy Spencer—responded to a call for medical assistance and arrived with a jump bag (a bag containing emergency medical supplies and tools) and a wheelchair. They stayed back awaiting instructions from the officers who were in the cell and the additional officers who then entered the cell (Officers William Smith, Brent McBride, and Sergeant Anthony Key). Mr. Villegas did not respond to queries from Sergeant Fender and Officer Tifft, and the two handcuffed Mr. Villegas with his hands in front of him and applied leg irons. Officer Smith noticed that Mr. Villegas had labored breathing and that he had vomited inside and outside of his cell.

The officers turned Mr. Villegas, who was still restrained, on his side to give him a clear airway. Though he was still unresponsive, and with labored breathing, Nurses Fischer and Spencer

---

deliberate indifference collectively. The district court, accordingly, grouped and treated the officers together, and I do the same. *See* D.E. 96 at 12, 15.

[4] The facts which follow are taken from the report and recommendation issued by the magistrate judge. *See* D.E. 83 at 3–12.

remained back awaiting instructions from the officers. Sergeant Fender thought that Mr. Villegas' behavior was consistent with the use of K2 (synthetic marijuana), and Officer Smith testified that he was aware prior to this incident of another inmate dying while under the influence of K2. Indeed, prison officials knew that K2 was an increasingly serious problem at the Lake Correctional Institution.

Sergeant Fender attempted to rouse Mr. Villegas by performing a sternum rub. When Mr. Villegas responded—he was agitated and combative but still restrained—the officers used force against him. For example, the officers used their body weight to keep Mr. Villegas in a prone position. During this time Mr. Villegas was groaning and making other noises—what the officers described as resistance.

Then Sergeants Fender and Key and Officers Tifft, McBride, and Smith dragged Mr. Villegas—whose hand and leg restraints were still in place—out of the cell and into the dayroom. They continued to use their arms and legs to hold Mr. Villegas down because he supposedly kept trying to get up and run away. At that point, the officers present at the scene ordered Nurses Fischer and Spencer to leave the dayroom.

More officers were called, and at one point as many as seven simultaneously restrained Mr. Villegas. Some applied a spit shield that covered his mouth and used a tether to move his handcuffs from the front of his body to behind his back. Mr. Villegas was on his stomach, further restricting his ability to breathe. When this

22-10881          Jordan, J., Dissenting          11

was done, Lieutenant Milton Gass announced "hands on legs on," and Mr. Villegas ceased his combative behavior and all force ended. The application of force had lasted at least 20 minutes.

At this point Mr. Villegas was face down and throwing up with his hands handcuffed behind his back. He was not combative. Nor was he resisting. Nevertheless, as set out below, the officers failed to seek or provide or allow *any* assessment or medical care.

Several officers lifted Mr. Villegas into a sitting position, as he was unable to do that on his own. They put him against a table in a seated position, where he remained for over a minute. A number of officers had to use their hands to prevent him from falling over. He was, in the words of the district court, "motionless with his head down." D.E. 96 at 7. To Officer Donald Foster—one of the officers who had arrived later—Mr. Villegas looked like he had passed out. Captain James Disano agreed that Mr. Villegas was unresponsive, and the labored and shallow breathing was concerning to Lieutenant Gass.

The Chief Deputy Medical Examiner who performed the autopsy, Dr. Wendy Lavezzi, explained that once Mr. Villegas was put in the wheelchair it would have been a good time for the nurses to check his breathing and/or pulse. *See* D.E. 54-1 at 61. Yet again the officers failed to seek or provide or allow *any* assessment or medical care. None of the officers checked Mr. Villegas' pulse. Nor did they call for Nurses Fischer and Spencer, who were right outside the dorm (E Dorm). Sergeant Fender explained that a medical assessment was not undertaken because no one instructed him to

do so.  But it was apparent to all that Mr. Villegas required medical evaluation and treatment.  At the very least, a jury could so find given what the officers saw with their own eyes.

Having chosen not to perform (or allow the nurses to perform) a medical assessment at that time, the officers decided to move Mr. Villegas by wheelchair to the next dorm (F Dorm)—which was minutes away—for an assessment.  Lieutenant Gass, who was concerned about Mr. Villegas falling out of the chair, told the officers to put his arms behind the wheelchair's back—which made breathing more difficult—so that he did not fall out.  As the officers began wheeling Mr. Villegas away, they exerted downward pressure on his head, neck, and shoulders as a purported safety precaution even though he was unresponsive by this time.  *See* D.E. 47-1 at 110–12; D.E. 50-1 at 143.

According to expert testimony, both of these actions—the placing of Mr. Villegas' arms behind the wheelchair and the exertion of downward pressure on his head, neck, and shoulders—may have, and likely did, constrict the airway of Mr. Villegas and restrict the circulation of blood in his body.  For example, Dr. Lavezzi testified that, during the time Mr. Villegas sat "with his hands pulled back like that," his ability to breathe was compromised because the position "constrict[ed] the chest expansion."  D.E. 54-1 at 51–52. Similarly, with regard to the positioning of Mr. Villegas' head, Dr. Timothy Hughes testified that "in an unresponsive individual . . . [o]ne of the things you want to make sure you do is maintain a patent airway, and that's difficult to do with your neck

hyperflexed." D.E. 77-1 at 66. Again, *no* assessment or medical care was sought, provided, or allowed by the officers before this transport began. Indeed, no one had even checked Mr. Villegas' breathing or pulse. According to Mr. Stalley's expert, Aubrey Land, the situation was dangerous and called for an immediate medical assessment. *See* D.E. 76-1 at 173.

Outside of E Dorm, the officers wheeled an unresponsive Mr. Villegas right by Nurses Fischer and Spencer. But again the officers did not request that the nurses examine him or evaluate him. In fact, the officers *actively prevented* the nurses from checking on Mr. Villegas despite the presence of a second jump bag at the E Dorm exit. Nurse Fischer, for example, wanted to assess Mr. Villegas—who was unresponsive and not moving—once he was in the wheelchair, and she did not see any safety concerns that would have prevented her from doing so. But when she approached Mr. Villegas, she was told by one of the officers to "stop and back up," and she did as instructed. *See* D.E. 51-1 at 31–32. As she put it, "they [the officers] wouldn't let us [the nurses] near him." *Id*. at 24. In Nurse Fischer's view, a three to four minute delay in conducting a medical assessment eats up precious minutes—"that's death." *Id*. at 36–37. Nurse Spencer agreed that she saw no movement when Mr. Villegas was put in the wheelchair and that it would have taken only "a few seconds" to determine whether he was breathing or had a pulse. *See* D.E. 51-5 at 145.

The magistrate judge accurately summarized the events up to this point: "Notably . . . [Mr.] Villegas was not examined or

offered medical care when he was unresponsive in his cell, after he was restrained initially in his cell, after he was restrained again (though this time with his hands behind his back), after he was propped up against the table, or after he was hoisted into the wheel-chair. There is evidence that from the beginning there were nurses close by to examine him. But instead after all of those events, he was wheeled to the F Dorm for a medical assessment." D.E. 83 at 7.

On the way to F Dorm, the officers stopped to replace Mr. Villegas' spit shield because the first one had torn. Despite pausing for this purpose, the officers once more failed to assess Mr. Villegas and declined the opportunity to have the nurses examine him (or render assistance). Crucially, this pause lasted another 25 seconds. Nurse Spencer, it bears repeating, believed that a potentially life-saving assessment would have taken only "a few seconds." D.E. 51-5 at 145.

When they arrived at F Dorm, the officers took Mr. Villegas to the medical treatment room. Nurse Fischer, finally able to assess him, noticed that he was not breathing and did not have a pulse. About two minutes later, CPR was started and continued until emergency medical personnel arrived. Mr. Villegas was taken to South Lake Hospital, where he was pronounced dead.

Dr. Lavezzi concluded that Mr. Villegas' death was a homi-cide, meaning "death as a result of an intentional act by another human being." D.E. 54-1 at 25–26. She found pinpoint hemor-rhages on Mr. Villegas' upper shoulders and back, indicating that

the pressure on his body had inhibited the return of blood to his heart.  The cause of death was restraint asphyxia, with excited delirium as a contributing condition.

To put these troubling events into perspective, over five minutes elapsed from when Mr. Villegas was restrained and unresponsive in E Dorm to when Nurse Fischer was able to assess him (the officers fully restrained Mr. Villegas at 4:39:26 p.m. and a medical evaluation was not completed until at least 4:44:49 p.m.).  These minutes were pivotal according to the expert witnesses.  For example, Dr. Hughes testified that when "an individual is suffering a life-threatening arrhythmia, for every minute of time delay . . . their chance of survival decreases by seven to ten percent."  D.E. 77-1 at 72–73.  Dr. Hughes estimated that the correctional officers "had reduced his [Mr. Villegas'] chance of survival by seventy, [or] seventy-five percent" by delaying medical care.  *See id.* at 73.

### III

The district court correctly concluded that there was sufficient evidence for a jury to find that the correctional officers knew Mr. Villegas was in medical distress "once he was in the wheelchair or immediately before" because he had recently vomited, passed out, and exhibited labored breathing.  *See* D.E. 96 at 38, 41.  As the district court highlighted, the officers also knew or suspected that he was under the influence of some drug (possibly K2), and knew he had struggled with them for about 20 minutes.  *See id.* at 42.  The only element of deliberate indifference at issue here, therefore, is whether the officers consciously disregarded the risk in a manner

amounting to criminal recklessness.  *See Farmer*, 511 U.S. at 837, 847.

## A

As noted earlier, a "prison official may be held liable . . . if he knows that [an] inmate[ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  *Id*. at 847.  This is a two-pronged inquiry.  The first question is whether a prison official is subjectively aware that their action, or inaction, would cause excessive harm. As I explained in *Wade*, 106 F.4th at 1262 (Jordan, J., concurring), our cases over the last 20 years make it abundantly clear that the second question is whether the prison official failed to respond in a reasonable manner and is analyzed under an objective standard.  *See, e.g., Mosley v. Zachery*, 966 F.3d 1265, 1270 (11th Cir. 2020); *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020); *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

I agree with the majority and the concurrence that under *Farmer* and *Wade* the deliberate indifference inquiry in part involves a subjective component.  *See* 106 F.4th at 1254.  Nobody disputes this.  My point is that the summary judgment record, viewed in the light most favorable to Mr. Stalley, allows a jury to find (a) that the correctional officers had subjective knowledge that their inaction— the delay of medical care for over five minutes—would cause Mr. Villegas' serious medical condition to worsen, and (b) that the officers failed to respond in a reasonable manner.  The majority incorrectly adopts the district court's factual mischaracterization at

summary judgment of the officers' action as a medical decision, rather than a delay of necessary medical care.

In cases like this one that "turn on the delay in providing medical care, rather than the type of medical care provided, we have set out some factors to guide our analysis. Where the prisoner has suffered increased physical injury due to the delay, we have consistently considered (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert*, 510 F.3d at 1327 (citations omitted).

The officers' delay in seeking or obtaining medical care for Mr. Villegas after he was fully restrained and motionless amounted to over five minutes. The officers, moreover, provided no valid reason for this long delay given the life-threatening condition faced by Mr. Villegas. And, to make matters worse, even though there were no safety concerns once Mr. Villegas was fully restrained and motionless, the officers twice prevented the nurses who were on the scene from assessing him or checking his vital signs. Under *Bozeman* and *Valderrama* a jury could easily find that the officers acted with deliberate indifference. Moreover, the officers are not entitled to qualified immunity.

The majority tries to distinguish *Valderrama* by emphasizing the misreported gunshot wound and delayed ambulance call at issue there. This attempt fails for several reasons. Here, as in *Valderrama*, it was the officers who caused Mr. Villegas' death (a homicide according to Dr. Lavezzi) through restraint asphyxia. So in both cases, the officers were responsible for the individual's serious and

life-threatening medical predicament. *Valderrama*, moreover, explains that in a delay-of-care case involving a life-threatening condition, clearly established law is not measured by the number of minutes in which medical attention was delayed. A ten-minute delay can, as we held in *Valderrama*, constitute deliberate indifference where officials needed to call medical professionals to the scene. A jury, though, could just as easily find deliberate indifference in a situation involving a delay of over five minutes where, as here, medical professionals (the nurses) were already present on the scene, and sought to provide assistance, but the officers actively prevented them from doing so. Finally, *Valderrama* makes clear that a prior case directly on point is not needed to provide fair notice.[5]

---

[5] The concurrence apparently wants to do away with 30 years of Eleventh Circuit deliberate indifference precedent, unless a case shows that deliberate indifference does not exist on a "materially identical or less extreme" set of facts. Concurrence at 14 n.1. This one-way ratchet is, in my view, flawed. It cannot possibly be that *Wade*, *sub silentio*, completely abrogated three decades of Eighth Amendment case law. First, *Wade* said nothing whatsoever about *en masse* abrogation. Second, to constitute abrogation an en banc decision like *Wade* "must demolish and eviscerate each of [the prior decision's] fundamental props." *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024) (internal quotation marks and citation omitted). Abrogation is decided on a case-by-case basis, which looks nothing like the concurrence's attempt to deem "all of the pre-*Wade* decisions . . . obsolete, extinct, gone, insofar as establishing that deliberate indifferent does exist in a post-*Wade* conduct case." Concurrence at 14. Third, both *Bozeman* and *Valderrama* used the "more than gross negligence" formulation—a higher and more difficult standard than "more than mere negligence." *See* 422 F.3d at 1272; 780 F.3d at 1116. Given the standard articulated and applied in these cases, I fail to understand how they could have

**B**

The district court made a number of mistakes in granting summary judgment to the officers. Each one, I believe, independently warrants reversal.

First, to the extent that there existed an intra-circuit conflict about whether *Farmer* requires conduct that is "more than mere negligence" or "more than gross negligence," the district court erred in choosing the latter. Our earliest case on the issue used the "more than mere negligence" formulation, *see McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999), and the district court was required to follow that precedent. *See generally Morrison v. Amway*, 323 F.3d 920, 929 (11th Cir. 2003) (explaining that when faced with an intra-circuit conflict "a panel should look to the line of authority containing the earliest case").[6]

Second, the district court treated this case as one involving only alleged inadequate medical care. But that was an incorrect characterization, particularly at summary judgment. Here there was a delay that amounted to the denial of medical care to an unresponsive inmate during a critical time. At the very least, a jury could so find, and the district court erred by weighing the evidence. And, contrary to the district court's statement, there is no "shock

---

become irrelevant. If the concurrence deems these decisions abrogated, then that further shows the errors of its ways. *See Wade*, 106 F.4th at 1265 (Jordan, J., concurring).

[6] Our recent en banc decision in *Wade* did away with the "more than mere negligence" and "more than gross negligence" formulations.

the conscience" requirement in delay-of-care cases brought under the Eighth Amendment. *See, e.g., Lancaster*, 116 F.3d at 1425.

The district court improperly weighed and credited testimony from Lieutenant Gass that taking Mr. Villegas to F Dorm was proper because the treatment room at that dorm had oxygen, an IV, and an on-call doctor. *See* D.E. 96 at 45. The issue at hand is the delay in care during a time period in which the officers failed to provide *any* assessment or medical care and refused to allow the nurses to even see Mr. Villegas. It would be different if the nurses, after assessing Mr. Villegas on the scene, had determined that oxygen and other medical supplies were needed and were available only in F Dorm. But that's not what happened. The nurses testified that it would have been safe for them to approach Mr. Villegas to assess his condition once he was restrained in the wheelchair, but instead they were denied access until he was transported to F Dorm, when it was too late.

The evidence, viewed in the light most favorable to Mr. Stalley, simply does not support the district court's conclusion that the decision to transport Mr. Villegas to F Dorm, delaying critical medical care, warrants qualified immunity for the officers. On the one hand, the officers claimed that Mr. Villegas was well enough that he presented an ongoing risk of physical violence—even when restrained in the wheelchair. On the other hand, the officers testified that Mr. Villegas' medical state was so worrisome as to require additional medical assistance beyond what the nurses could provide in E Dorm with their jump bags.

The officers cannot have it both ways at summary judgment. If the officers believed that Mr. Villegas was well enough to pose a continued physical threat to them—as evidenced, for example, by their decision to exert pressure on his head, neck, and shoulders while he sat in the wheelchair—then Mr. Villegas did not require extraordinary care and the officers were obligated to allow a preliminary, on-site assessment by the nurses. Conversely, if the officers believed that Mr. Villegas was so compromised medically as to require extraordinary care at F Dorm, then their decision to exert physical pressure on his body—further constricting his airway—and to stop for 25 seconds for the replacement of the spit shield while still denying him medical care was inconsistent with their duty to Mr. Villegas. In the end, the record demonstrates that the eventual measures taken at F Dorm, such as permitting the nurses to assess vitals and administer CPR in response, could have easily occurred at E Dorm and potentially saved the life of Mr. Villegas.

Third, the district court concluded that the officers' decision to take Mr. Villegas to the medical treatment room at F Dorm "was a form of medical treatment," D.E. 96 at 43, but surely a jury could find otherwise. A jury could find that the officers, who knew of Mr. Villegas' significant medical distress, had subjective knowledge that delaying care for a man in his condition of significant medical distress would cause excessive harm. A jury could further find that the officers acted in an objectively unreasonable manner: they provided *no assessment or medical care whatsoever* to Mr. Villegas during the critical period of time—more than five minutes—between the end of his resistance (when he was unresponsive) and his arrival at

F Dorm. And though they chose to stop for 25 seconds to change Mr. Villegas' spit shield, they could not be bothered to allow the nurses to evaluate him. Indeed, the officers made matters worse by twice actively preventing the nurses, who were present and willing to assess Mr. Villegas, from approaching him to check on him or provide medical care. A jury could reasonably find that the officers failed to take reasonable steps to assist Mr. Villegas and affirmatively blocked the nurses from coming to his aid.

"The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" *Farmer*, 511 U.S. at 843 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). The evidence, viewed in the light most favorable to Mr. Stalley, allows a jury to find that (a) the officers knew that Mr. Villegas had a serious medical need at least when he was placed in the wheelchair and was unresponsive (when he was not resisting any more, vomited again, and had labored breathing); (b) the officers knew that Mr. Villegas faced a substantial risk of serious harm as a result of a delay in, and denial of, medical care; (c) the denial of medical care and the over five-minute delay in providing such care to Mr. Villegas worsened his medical condition; and (d) the delay was objectively unreasonable because there was no good reason for preventing the nurses who were onsite from evaluating Mr. Villegas to determine what medical steps needed to be taken after he had stopped resisting and was unresponsive.

The officers here failed to take *any* available "reasonable measures," *Farmer*, 511 U.S. at 847, to abate the risk of significant harm to Mr. Villegas.  *See Nelson v. Tompkins*, 89 F.4th 1289, 1297–99 (11th Cir. 2024); *Goebert*, 510 F.3d at 1327.  Under *Bozeman,* 422 F.3d at 1273–74, and *Valderrama*, 780 F.3d at 1120–22, a jury could find that the officers acted with deliberate indifference by delaying *any* medical care or assessment for Mr. Villegas for over five minutes after he was motionless and unresponsive and by preventing the nurses from seeing him.  And under those cases, the officers are not entitled to qualified immunity.  "[H]aving stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid, [correctional officers are] not free to let the state of nature take its course."  *Farmer*, 511 U.S. at 833.

It is appropriate to close by recalling that Dr. Lavezzi classified Mr. Villegas' death as a homicide.  *See* D.E. 54-1 at 25–26.  On this record, and given our decisions in delay-of-care cases like *Bozeman* and *Valderrama*, it is difficult to understand how the majority can affirm summary judgment in favor of the officers.

## IV

"Even where the underlying facts are undisputed, summary judgment is improper if those facts can lead to conflicting inferences on material issues."  *Carrizosa v. Chiquita Brands Int'l Inc.*, 47 F.4th 1278, 1328 (11th Cir. 2022).  Both the district court and the majority have, in my view, improperly acted as triers of fact at

24                    JORDAN, J., Dissenting                    22-10881

summary judgment by choosing to emphasize certain facts and inferences over others.  I respectfully dissent.[7]

---

[7] Like others, I have said elsewhere that the Supreme Court's qualified immunity jurisprudence is mistaken and should be corrected. *See Sosa v. Martin Cnty.*, 57 F.4th 1297, 1303 (11th Cir. 2023) (en banc) (Jordan, J., concurring). And recent historical scholarship also suggests that, when the statute that became § 1983 was enacted, Congress included the phrase "any such law, statute, ordinance, regulation, custom or usage of the state to the contrary notwithstanding." This phrase was incorrectly omitted by the first Reviser of Federal Statutes when the first edition of the Revised Statutes of the United States was published in 1874. *See* Alexander A. Reinhert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201, 235–38 (2023). As some judges have explained, this revelation has significant consequences for today's qualified immunity doctrine. *See, e.g., Price v. Montgomery Cnty., Ky.*, 72 F.4th 711, 727 n.1 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 2499 (2024) (Nalbandian, J., concurring in part and dissenting in part); *Rogers v. Jarrett*, 63 F.4th 971, 979–81 (5th Cir. 2023) (Willet, J., concurring). If today's decision is a harbinger of where qualified immunity has put us, the correction of the doctrine can't come fast enough.